[S. F. No. 22591. In Bank. Nov. 13, 1968.]

THE PEOPLE ex rel. SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION, Plaintiff and Appellant, v. TOWN OF EMERYVILLE, Defendant and Respondent.

534

Thomas C. Lynch, Attorney General, Clayton P. Roche, L. Donald Boden and E. Clement Shute, Jr., Deputy Attorneys General, for Plaintiff and Appellant.

C. E. Fletcher, City Attorney, Breed, Robinson & Stewart and James R. McCall for Defendant and Respondent.

MOSK, J.—On behalf of the San Francisco Bay Conservation and Development Commission (hereinafter BCDC), the Attorney General brought suit to enjoin certain fill operations by the Town of Emeryville on the ground that Emeryville had not obtained a BCDC permit as directed by the McAteer-Petris Act. (Gov. Code, § 66604.) The trial court concluded that Emeryville was not required to secure a permit because its fill operations were assertedly exempted under the "grandfather clause" in the BCDC enabling legislation. (Gov. Code, § 66632.1.)[1] The court entered judgment for Emeryville and dissolved an injunction which had theretofore restrained the town from conducting further fill activities. This appeal followed.

## I

In view of the urgency of the litigation we ordered the cause transferred to this court. (Cal. Rules of Court, rule 20.) At that time we issued an order enjoining all fill operations by the town pending final determination of the appeal. We deemed the stay basic to the maintenance of this court's appellate jurisdiction because resumption of fill activities would have imperiled the value of appellant's right of appeal.

 Emeryville insists that this court lacked jurisdiction to stay its fill activities since there was no process or order which this court could supersede or suspend once the trial court had dissolved its restraining order. While the town's position is supported by older cases (see, e.g., *In re Imperial Water Co.* (1926) 199 Cal. 556, 557-558 [250 P. 394]), the preferable rule, which we henceforth follow, was recently declared in *Deepwell Homeowners' Protective Assn.* v. *City Council* (1965) 239 Cal.App.2d 63, 65-66 [48 Cal.Rptr.

---

[1]The "grandfather clause" in Government Code section 66632.1 reads as follows: "Nothing in this title shall apply to any project where necessary local governmental approval and a Department of the Army Corps of Engineers permit have been obtained to allow commencement of the diking or filling process, and where such diking or filling process has commenced prior to the effective date of this title, nor to the continuation of dredging under existing Department of the Army Corps of Engineers permits."

321] : ''So, too, the rule now is that in aid of their appellate jurisdiction the courts will grant supersedeas in appeals where to deny a stay would deprive the appellant of the benefit of a reversal of the judgment against him, provided, of course, that a proper showing is made. On principle, it would be a terrible situation if in a proper case an appellate court were powerless to prevent a judgment from taking effect during appeal, if the result would be a denial of the appellant's rights if his appeal were successful.''

A trial court's familiarity with the evolving circumstances of a case normally constitutes it the appropriate forum to weigh the relative hardships on the parties, including the likelihood that substantial questions will be raised on appeal, and its refusal to grant or to continue an injunction during appeal is entitled to great weight. But where, as here, difficult questions of law are involved and the fruits of a reversal would be irrevocably lost unless the status quo is maintained, justice requires that an appellate court issue a stay order to preserve its own jurisdiction. While this power should be sparingly employed and reserved for the exceptional situation, the propriety of its exercise in this case cannot be seriously disputed: had Emeryville been permitted to resume its fill activities, it would have been able, as a practical matter, to render this appeal moot.

The town contends, however, that the stay order issued by this court was beyond its inherent powers because the writ, injunctive in effect, is not specifically authorized in the judicial article of the state Constitution. Before the 1966 amendment the relevant provision of the state Constitution read: ''The said [Supreme] court shall have power to issue writs of mandamus, certiorari, prohibition and habeas corpus, and all other writs necessary or proper to the complete exercise of its appellate jurisdiction.'' (Former art. VI, § 4.) The present provision reads: ''Those courts [of record, other than municipal] also have original jurisdiction in proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition.'' (Art. VI, § 10.)

Emeryville argues that the 1966 amendment deprived this court of the power to issue an injunctive order staying its fill operations. In this connection the town notes that the California Constitution Revision Commission said of the proposed change that it meant ''by use of the phrase 'in the nature of mandamus, certiorari, and prohibition,' to preclude the crea-

tion of new forms of relief unrelated to the traditional three writs named.'' (Proposed Revision of the California Constitution (February 1966) at p. 90.)

■ A distinction must be drawn, however, between writs ''on the merits,'' such as mandamus, certiorari, and prohibition, which themselves grant the substantive or procedural relief sought by the petitioner; and purely auxiliary writs such as supersedeas, which have the sole function of preserving the court's jurisdiction while it prepares, usually in the context of an appeal, to rule on those merits. The quoted language of the Constitution Revision Commission relates to the former only; indeed, in that regard the 1966 amendments gave the courts more power rather than less: ''The Commission deliberately broadened the constitutional language relating to jurisdiction in extraordinary writ proceedings. In place of the restrictive language formerly appearing in the Constitution, the language used in Section 10 is phrased in such a way as to permit the courts to grant 'extraordinary relief in the nature of' the historical common law writs.'' (Cal. Judicial Council, 1967 Rep. to the Governor and the Legislature, p. 75.)

By contrast, no explicit constitutional grant is necessary to authorize issuance of such auxiliary writs as supersedeas, long recognized to be an attribute of the inherent power of the courts to preserve their own jurisdiction. (*Ohaver* v. *Fenech* (1928) 206 Cal. 118, 123-124 [275 P. 555], and cases cited.) ''Among the many procedural phrases deleted from the former Constitution, the Commission deleted references to the appellate courts' power to issue 'writs in aid of appellate jurisdiction'—*i.e.*, the writ of supersedeas. This action was taken upon the ground that *any such stay in aid of appellate jurisdiction* constitutes an exercise of the inherent power of the courts having that jurisdiction.'' (Italics added.) (Cal. Judicial Council, *op. cit. supra,* at pp. 76-77.) The elimination of such surplusage, which was one of the primary tasks of the commission, thus has no substantive significance. ■ We are not unmindful that the stay order in this case is injunctive in nature, since it operates directly to restrain the fill activities of the town; but its office remains similar to that of a writ of supersedeas—to preserve the status quo pending determination of the appeal—and its issuance is therefore controlled by the same principles.

■ Furthermore, in the newly enacted chapter govern-

ing civil appeals (Code Civ. Proc., § 901 et seq.; Stats. 1968, ch. 385), the Legislature affirms the inherent power of appellate courts in this state to issue injunctive stay orders in aid of jurisdiction: "The provisions of this chapter shall not limit the power of a reviewing court or of a judge thereof to stay proceedings during the pendency of an appeal or to issue a writ of supersedeas or to suspend or modify an injunction during the pendency of an appeal *or to make any order appropriate to preserve the status quo, the effectiveness of the judgment subsequently to be entered, or otherwise in aid of its jurisdiction.*" (Italics added.) The stay order issued by this court, therefore, was not beyond our inherent powers.[2]

## II

The Attorney General contends that, as of September 17, 1965, the date the BCDC enabling legislation took effect, Emeryville had not sufficiently finalized its underlying plan to have a "project" within the scope of the "grandfather clause." We find it unnecessary to decide, however, whether the town had a "project" as of the effective date for the reason that subsequent occurrences dispel any notion that Emeryville may now avoid the BCDC permit requirement. We hold that fundamental changes necessitated in the underlying plan of Emeryville after the effective date clearly bring its fill activities within the jurisdiction of the BCDC.

For several years the Town of Emeryville has contemplated the filling and development of submerged lands within its geographic limits. The area in dispute is held in trust by the town under a tideland grant from the State of California. (Stats. 1919, ch. 515; as amended, Stats. 1959, ch. 921.) In 1959 the Legislature expanded the uses to which the tidelands could be devoted; pursuant to that expanded authority Emeryville thereafter commenced diking and filling, and also began to consider plans for the ultimate use of 144.5 acres to be filled.

---

[2]Elsewhere, appellate courts issue stay orders to preserve jurisdiction. Under the All Writs Act (28 U.S.C., § 1651) federal courts of appeal, for example, issue injunctive stay orders against private parties. (See *Federal Trade Com.* v. *Dean Foods Co.* (1966) 384 U.S. 597, 605, fn. 3 [16 L.Ed.2d 802, 808, 86 S.Ct. 1738].) A noteworthy illustration is the emergency order signed by Wright, J., in *Application of President & Directors of Georgetown College, Inc.* (D.C. Cir. 1964) 331 F.2d 1000 [118 App. D.C. 80, 9 A.L.R.3d 1367], cert. denied (1964) 377 U.S. 978 [12 L.Ed.2d 746, 84 S.Ct. 1883].

Prior to September 17, 1965, Emeryville had purchased a bulldozer and hired a dredge that commenced construction of one of two access roads leading to the main fill area. At that time the town had no firm plans to acquire and was under no contractual obligation to buy or to receive fill; the fill was accepted gratuitously from contractors under no duty to deliver it. The dredge, according to city council resolution, was hired "on a day-to-day basis at the discretion of the City Engineer. . . ." By September 1965, the Powell Street Causeway had been substantially completed as a result of the town's filling and diking activity. As of the effective date of the act, Emeryville had expended or incurred obligations to a total of $55,000 for equipment purchase and rental, soil and engineering services, architectural fees, and other costs in connection with its planning, diking, and fill activities. Work on the Ashby Avenue Causeway, the second access road, began after September 17, 1965, and continued until the Attorney General secured a preliminary injunction enjoining further fill activity. Since June 1966 all fill activities have been suspended by this litigation.

As of the effective date of the act, the town had not arranged for the financing of the development or even for the financing of the fill portion of the development. On September 13, 1965, four days before the act became effective, Emeryville formally approved Phase A of a three-phase development scheme prepared by an architectural firm it had retained. The architect in charge testified that the brochure submitted by his firm, which set forth Phase A, was a "general plan," since "in our view this whole thing was somewhat promotional." In this general plan the firm recommended a pattern of land uses for the fill area. Entitled "Master Plan Development," Phase A included such items as a zoning plan indicating land use, densities, setback restrictions, the configuration of streets, lagoons, bulkheads, location of main utility runs, a master plan layout of the civic center, yacht harbor, public parks and promenades, and commercial areas, and the development of overall budget estimates. Phase B was entitled "architectural control" and Phase C, "architectural services." Implementation of the general plan outlined in Phase A was mainly reserved for Phase B, not then detailed or adopted because the basic engineering for the development had yet to be performed. The architect testified that engineering work for Phase B could start while the fill was being

placed. He further testified that the general plan could not be made more specific until Emeryville had resolved the financing arrangements for its development proposals.

As of September 17, 1965, Emeryville had not arranged for the financing of the fill portion of the proposed development. At trial the mayor testified it would cost about $5,500,000 to finance the process of filling the main area, and although the town had a surplus of approximately $500,000 in its treasury, that money was not committed to the fill project, and the town could not, in the short run, undertake the financing of the fill without outside assistance. It was then estimated that the actual cost of the fill alone would be about $4,500,000. Sometime in the fall of 1965 it became known that sufficient free fill was available for the development from excavation jobs in connection with Bay Area Rapid Transit (BART) construction; but as of September 17, 1965, no contracts had been negotiated with BART, and it is unclear from the record whether Emeryville by that time had even contemplated arrangements for obtaining free fill from BART contractors.

Before the availability of BART fill became known, the town had planned to finance the fill operation by raising the required capital through floating the bonds of a nonprofit corporation. Emeryville had retained a financial consultant, who advised that clearance from the State Lands Commission would be required before financing the development as a whole, or merely the fill portion thereof, could be arranged. By the effective date of the act the town had not received such clearance. Other conditions precedent, according to Emeryville's own consultant, included a ruling from the Internal Revenue Service that the bonds would be tax exempt, a permit from the Corporations Commissioner authorizing the issuance of securities, the submission to the prospective lender of an engineering report confirming feasibility of construction, and a firm construction bid for harbor dredging, land fill and harbor construction. The corporation was not formed, and Emeryville did not attempt to satisfy the several other conditions. The total cost of all phases of the proposed development was approximately $250,000,000. No evidence in the record indicates that the town had in any way begun to assemble any portion of this vast capital outlay.

As of the effective date of the act, Emeryville intended to use the fill area primarily for private residential development. In its waterfront proposal, as then adopted, the town reserved

109 acres, over 75 percent of the area to be filled, for housing of various densities with an anticipated population of 15,700 persons. The land use pattern, budget estimates, and other aspects of the proposal were designed to service this population.

Subsequent events required the town to make fundamental changes in its development proposal. The State Lands Commission questioned the legality of the town's proposal: in its view wide-scale residential use was inconsistent with the terms of the town's tideland grant. In an attempt to reach a negotiated settlement with the commission, the town, in late February 1966, reduced the anticipated population to 6,000 persons and also limited the land area to be set aside for private residential use to 50 acres. The Lands Commission refused to accede to the development proposal, as modified, and as of the commencement of this appeal the town still had litigation outstanding against the commission to obtain its approval. In the interim the Legislature has foreclosed the possibility of any private residential use by deleting residential purposes from among the uses to which Emeryville may put the tidelands. (Stats. 1968, ch. 415.) Emeryville cannot now, therefore, realize its waterfront proposal as envisioned on the effective date.[3]

We are not here concerned with the Army Corps of Engineers' permit requirement contained in Government Code section 66632.1, for the Attorney General agrees that such a permit was not required here. It is likewise clear that the town had at least commenced a filling and diking process since, as of the effective date, it had nearly completed one of two access roads leading to the main fill area. On the basis of the foregoing the trial court concluded that Emeryville was engaged in a "project" and "for many months prior to September 17, 1965, the Town was committed to and actively

[3]This was not unanticipated. Indeed, as of the effective date, Emeryville was on notice with a warning that its waterfront program might be inconsistent with the terms of its tideland grant. Senator Holmdahl, who then represented the town, requested the Attorney General for his opinion on the legality of the waterfront development proposal prior to its approval by the town council. By letter in May 1965, the Attorney General informed Senator Holmdahl: "It is difficult to see how permanent condominium type housing and the other permanent residences of the contemplated 'water-oriented community' which occupy so much space in proportion to the area devoted to harbor purposes will not interfere with the trust. But this is a determination to be made initially by the town council. It is a mixed question of law and fact upon which we can supply guides but no definite answer.''

engaged in an intensive program of activities to complete the said project.''

On this appeal the meaning of the word "project," as used in section 66632.1, constitutes the principal issue of law raised by the parties. The trial court, in adopting the interpretation advanced by Emeryville, concluded, as expressed in its memorandum of decision, that "project" embraced all undertakings satisfying the conditions in the grandfather clause. Since the trial court did not accord "project" any independent meaning, it did not consider relevant the basic planning changes required of Emeryville after the effective date.

 Where, as here, the facts are not in significant dispute, we are not bound by the trial court's conclusions of law. "We must here ascertain the proper conclusion indicated by the probative facts presented by the record.'' (*Ruberoid Co.* v. *California Unemp. Ins. Appeals Board* (1963) 59 Cal.2d 73, 78 [27 Cal.Rptr. 878, 378 P.2d 102]; see also *Aerojet General Corp.* v. *D. Zelinsky & Sons* (1967) 249 Cal.App.2d 604, 610 [57 Cal.Rptr. 701].) Therefore, regardless of the status of the initial plan, the basic changes made by Emeryville in its waterfront development program compel the conclusion that there is now a new project not exempt from BCDC jurisdiction.

 It is a wise and well-settled principle of statutory construction that "where the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms. In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception, must establish it as being within the words as well as within the reason thereof.'' (*United States* v. *Dickson* (1841) 40 U.S. 141, 163 [10 L.Ed. 689], quoted with approval in *Forbes* v. *City of Los Angeles* (1929) 101 Cal.App. 781, 788 [282 P. 528]; see also *Harris* v. *Alcoholic Beverage etc. Appeals Board* (1964) 61 Cal.2d 305, 309-310 [38 Cal.Rptr. 409, 392 P.2d 1].) A second principle, also firmly established, which must be applied in analyzing the legislative usage of the word "project," is that "the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in [the word's] interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute

should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice." (*People* v. *Asamoto* (1955) 131 Cal.App.2d 22, 29 [279 P.2d 1010].) (Italics omitted.)

The "objective sought to be achieved" by the McAteer-Petris Act is depicted with remarkable clarity. In the preamble the Legislature describes the public interest in the San Francisco Bay: "The Legislature hereby finds and declares that the public interest in the San Francisco Bay is in its beneficial use for a variety of purposes; that the public has an interest in the bay as the most valuable single natural resource of an entire region, a resource that gives special character to the bay area; that the bay is a single body of water that can be used for many purposes, from conservation to planned development; and that the bay operates as a delicate physical mechanism in which changes that affect one part of the bay may also affect all other parts. It is therefore declared to be in the public interest to create a politically-responsible, democratic process by which the San Francisco Bay and its shoreline can be analyzed, planned, and regulated as a unit." (Gov. Code, § 66600.)

In the next section the Legislature stresses the dangers inherent in self-generated and unregulated fill activities: "The Legislature further finds and declares that the present uncoordinated, haphazard manner in which the San Francisco Bay is being filled threatens the bay itself and is therefore inimical to the welfare of both present and future residents of the area surrounding the bay; that while some individual fill projects may be necessary and desirable for the needs of the. entire bay region, *and while some cities and counties may have prepared detailed master plans for their own bay lands, the fact remains that no governmental mechanism exists for evaluating individual projects as to their effect on the entire bay*; and that further piecemeal filling of the bay may place serious restrictions on navigation in the bay, may destroy the irreplaceable feeding and breeding grounds of fish and wildlife in the bay, may adversely affect the quality of bay waters and even the quality of air in the bay area, and would therefore be harmful to the needs of the present and future population of the bay region." (Italics added.) (Gov. Code, § 66601.)

The Legislature then finds that a new, regional approach is

necessary, and charges the BCDC with the task of preparing "a comprehensive and enforceable plan for the conservation of the water of the bay and the development of its shoreline." The BCDC is specifically obligated to consider the master plans of cities and counties surrounding the bay in formulating its own plan. (Gov. Code, § 66603.) In the next section the Legislature empowers the BCDC "to issue or deny permits, after public hearings, for any proposed project that involves placing fill in the bay or extracting submerged materials from the bay." This power is deemed "essential" in order "to protect the present shoreline and body of the San Francisco Bay to the maximum extent possible." (Gov. Code, § 66604.)

Notwithstanding these legislative findings, Emeryville contends that it had satisfied the conditions set forth in the grandfather clause, including commencement of the filling and diking process, in that it had a "project." No independent meaning, in Emeryville's view, can be ascribed to the word "project." Under that concept, however, a city or developer could proceed indefinitely, almost haphazardly, with fill activities in the absence of a plan, a construction which would work great violence on the regulatory scheme. Unless independent significance is attached to "project," in short, it would be impossible to ascertain exemptions under the act. Therefore we must determine what the Legislature intended by reference to the "project."

In view of the manifest intent of the Legislature "to protect the *present* shoreline and body of the San Francisco Bay to the maximum extent possible" (italics added) (Gov. Code, § 66604) and in view of its further direction to the BCDC to "give consideration to the master plans of cities and counties around the bay" (Gov. Code, § 66603), we are convinced that the Legislature used the word "project" as a term of limitation. The dominant theme underlying all generally accepted definitions of the word "project" is that of a detailed and specific plan prepared in furtherance of a determination to accomplish a certain objective. A determination without a concrete plan is not a "project" because the means of achieving the ultimate objective are not delineated sufficiently to permit prudent commencement of the enterprise. A plan without a determination is not a "project" because the operative decision to proceed toward the objective has not been made. Only

when that decision has been made and a plan has been conceived in the detail necessary for prudent commencement of physical efforts to achieve the objective does a "project" come into being. Thus, assuming a public agency had satisfied the two conditions for exemption of "projects" (i.e., governmental approval, if necessary, and commencement of the filling and diking process) the question remains whether the acts in satisfaction had been undertaken pursuant to a specific and detailed plan prepared in furtherance of a determination to accomplish a certain objective capable of realization—or whether such acts had been performed in some random manner unrelated to such a specific plan.[4] Weighing only the

---

[4]The Attorney General argues that, in addition to a reasonably specific and detailed plan, a "project" within the meaning of section 66632.1 must be characterized by substantial elements of commitment. An entity seeking exemption from the permit requirement must, in his view, offer proof of financial commitment as well as commencement of the filling and diking process.

But the express wording of section 66632.1, as well as its legislative history, make it clear that the Legislature was so concerned about defining the required quantum of "commitment" that it set forth express conditions for this very purpose. Those conditions have been satisfied by the town in the instant case: (1) local and Army Corps of Engineers' approval, and (2) actual commencement of the diking and filling process prior to the effective date of the act.

The McAteer-Petris Act does not represent the first effort to effect regional control over San Francisco Bay. On February 4, 1964, a bill was introduced, which if enacted would have provided in general that no portion of the bay should be filled from the effective date of the proposed legislation until 90 days after adjournment of the regular session of the 1967 Legislature except for certain specified purposes.

The exemptions to the proposed moratorium were to be of two kinds. The first of these was analogous to the permit power contained in the McAteer-Petris Act: the bill's proposed commission was empowered to grant exemptions "when emergency conditions exist or in situations which are of urgent importance to the public health, safety or welfare or in situations where a project is so far advanced that the prevention of its completion would cause serious economic loss." The second class of exemptions was analogous to the exemption set forth in section 66632.1 of the McAteer-Petris Act, for it set forth those classes of fill operations which would be outside the scope of the act and beyond the powers of the commission. There were eight specific exemptions set forth, and the eighth of these was for "(h) Fills for residential, commercial or industrial purposes, if already in process, with appropriate governmental approval, financing arrangements and contracts for fill completed and in use." Assembly Bill No. 19 was referred to the Committee on Rules and never came to a vote in the Assembly.

When the bill which was to become the McAteer-Petris Act, Senate Bill No. 309, was introduced on February 1, 1965, it contained no exemptive provisions of any kind. However, on March 25, 1965, the bill was amended to provide that "A permit may be granted for a project if the project is either (1) necessary to the health, safety or welfare of the public in the entire bay area, or (2) of such a nature that it will not adversely affect the comprehensive plan being prepared." (Gov. Code,

foregoing two conditions for exemption without considering the existence of a basic detailed plan would tend to reward those agencies, which act precipitously, with no specific constructive expectations, intending only to evade the act and to maintain their own options to the potential detriment of unitary development of the bay area.

On this record we are unprepared to say, as a matter of law, that Emeryville was not proceeding pursuant to a reasonably detailed and specific plan as of the effective date of the act. We already observed, however, that Emeryville cannot now realize its waterfront program as originally conceived: as indicated above, Emeryville knew, prior to the effective date, that its proposal might be deemed inconsistent with the terms of its tideland grant (see fn. 3, *ante*); Emeryville later substantially modified its proposal in an effort to

§ 66632, subd. (d).) On April 1, 1965, the bill was amended to provide the exemption section here in question: ''Nothing in this title shall apply to any project where necessary local governmental approval and a Department of the Army Corps of Engineers permit have been obtained to allow commencement of the diking or filling process, and where such diking or filling process has commenced prior to the effective date of this title. . . .'' (Gov. Code, § 66632.1.)

The March 25 amendment thus injects into section 66632 a portion of the standards for granting permits which had been found in the former Assembly proposal. However, the amended section 66632 does not provide that the granting of a permit may be premised upon ''emergency conditions'' or situations in which ''a project is so far advanced that the prevention of its completion would cause serious economic loss''—as the former bill had provided. Rather it provides only that a permit may be granted if the ''project'' in question ''is . . . of such a nature that it will not adversely affect the comprehensive plan being prepared.'' Thus it appears that the Legislature decided to withhold from the BCDC the power to grant exemption by permit based upon its determination as to the prospect of ''serious economic loss'' relative to a given proposed fill operation. The significance of this omission is that provision for exemption based upon change of position devolved entirely upon the amendment of April 1, 1965, which upon passage of the act became section 66632.1 of the Government Code.

That amendment was addressed to the same subject as the eight specific classes of exemptions which had been set forth in the former Assembly bill: namely, the subject of exemption through change of position or ''commitment.'' But, whereas the former bill had required the presence of four factors (1. filling already in process; 2. appropriate governmental approval; 3. financing arrangements completed and in use; 4. contracts for fills completed and in use) in order to warrant exemption on this basis, the new amendment required only two (1. local governmental approval and Corps of Engineers' permit; 2. commencement of diking or filling process). These two, it will be observed, are respective equivalents of the first two factors required in the former bill; there is no mention of the last two factors required in the former bill. We cannot reinstate conditions which, we can only assume, were consciously eschewed by the Legislature.

reach accommodation with the State Lands Commission; finally, under the 1968 amendment to its tideland grant (Stats. 1968, ch. 415), which we judicially note (Evid. Code, § 452, subd. (a)), Emeryville cannot use its tidelands for residential purposes, the principal objective sought in its waterfront program.[5] In this posture we must decide whether the complete overhaul now required of Emeryville's initial proposal brings any future waterfront program within BCDC jurisdiction.

Section 66632.1 allows cities and counties, which had justifiably relied on previous grants of authority, to continue with their projects. Like grandfather clauses appearing in other regulatory acts, section 66632.1 serves, as the BCDC legislation took effect, to preclude harsh and inequitable results. But even assuming, *arguendo*, that Emeryville's waterfront proposal, as of the effective date of the act, constituted an exempt project, frustration of the initial project does not justify permitting successor projects undertaken by the town to escape the BCDC permit requirement. The situation herein is not unlike that presented in *Harris* v. *Alcoholic Beverage etc. Appeals Board* (1964) 61 Cal.2d 305 [38 Cal.Rptr. 409, 392 P.2d 1]. We held that a person holding a dual liquor license under a grandfather clause could not transfer that status to a successor in interest. "The initial sanctioning of such licensing arrangements for the stated reason that the Legislature deemed it inequitable to conform certain business arrangements does not," we said, "justify the knowledgeable planning of prospective arrangements with intent to exploit the exception." (*Id.* at p. 310.) Likewise, once Emeryville abandoned its initial project—assuming the town had a "project"—it lost the protection of section 66632.1. We can only conclude that Emeryville is now obligated to secure a BCDC

---

[5] Whether modifications made in a plan after the effective date amount to a fundamental change ordinarily constitutes a question for the trier of fact. In Emeryville's case, however, the 1968 amendment to its tideland grant makes it unmistakably clear that the town cannot proceed with its original waterfront proposal, and thus no question of fact is presented. Although this amendment was not before the trial court, since it had not then been enacted, we can properly weigh its effect on appeal for "[W]hatever may be the law applicable to appeals generally, the rule is well settled that on appeals involving injunction decrees, the law in effect when the appellate court renders its opinion must be applied." (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.* (1935) 3 Cal.2d 489, 527-528 [45 P.2d 972]; *Complete Service Bureau* v. *San Diego Medical Soc.* (1954) 43 Cal.2d 201, 207 [272 P.2d 497].)

permit before recommencing its filling and diking activity on the basis of any newly developed plans.

## III

 Finally respondent contends that the BCDC constitutes a "special commission" which, by bringing this litigation, has interfered in the affairs of the town in contravention of article XI, section 13, of the California Constitution, which prohibits a delegation of authority over municipal functions. This contention has no merit. As heretofore indicated, the area which Emeryville proposes to fill is held in trust under a tideland grant from the State of California. The grant specifically requires that the facilities developed be limited to those in which there is a "general statewide interest." (Stats. 1959, ch. 921, p. 2952.) The BCDC enabling legislation amends, in effect, the terms of the tideland grant. It is settled that "the state acting through the Legislature has the power to alter contractual or property rights acquired by the municipal corporation from the state for governmental purposes." (*Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 209 [282 P.2d 481].) Since the Legislature acted within its settled power to alter the terms of a tideland grant, the BCDC enabling legislation constitutes a valid legislative act.

The judgment is reversed and the cause remanded with directions to enter an injunction enjoining the Town of Emeryville from proceeding with further diking and filling activity until such time as it has obtained a permit from the Bay Area Conservation and Development Commission.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied December 11, 1968, and the opinion was modified to read as printed above.