Filed 6/25/14 (unmodified version of opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SPRAWLDEF et al.,<br><br>　　　Plaintiffs and Respondents,<br><br>v.<br><br>SAN FRANCISCO BAY<br>CONSERVATION AND<br>DEVELOPMENT COMMISSION et al.,<br><br>　　　Defendants and Appellants,<br><br>WASTE CONNECTIONS, INC.,<br><br>　　　Real Party in Interest and Appellant. | A137619<br><br>(Solano County<br>Super. Ct. No. FCS039863)<br><br><br>ORDER MODIFYING OPINION<br><br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

On the court's own motion, the opinion filed on April 29, 2014, and ordered published on May 28, 2014, is hereby modified as follows:

1. On page 1, the first sentence of the second paragraph is modified to read to as follows:

   In the instant writ proceeding, petitioners contend the permit approvals violate the Solano County Local Protection Program and, specifically, a county ordinance, because the expansion will entail some rechanneling of an ephemeral watercourse called Spring Branch.

1

2. On pages 3, the last word of the paragraph which spans pages 2 and 3 shall be changed from "Plan" to "Program."

3. On page 4, the words "Solano County Local Protection Plan" contained in the second sentence of the first full paragraph shall be changed to "Solano County Local Protection Program".

4. On page 4, the words "local protection plan" contained in the third sentence of the first full paragraph shall be changed to "local protection program".

5. On page 8, the words "Solano County Local Protection Plan" contained in the first sentence of the last paragraph, shall be changed to "Solano County Local Protection Program".

Solano County Counsel's request that the opinion be corrected is hereby denied. There is no change in judgment.

Dated:

_____
Margulies, Acting P. J.

Filed 4/29/14  Certified for publication 5/28/14 (order attached) [unmodified version]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SPRAWLDEF et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>SAN FRANCISCO BAY<br>CONSERVATION AND<br>DEVELOPMENT COMMISSION et al.,<br><br>        Defendants and Appellants,<br><br>WASTE CONNECTIONS, INC.,<br><br>        Real Party in Interest and Appellant. | A137619<br><br>(Solano County<br>Super. Ct. No. FCS039863) |

        Solano County and the San Francisco Bay Conservation and Development Commission approved permits to allow real party in interest Waste Connections, Inc. to expand the Potrero Hills Landfill, which is situated within the secondary management area of the Suisun Marsh.  The permits were issued after years of environmental review and litigation under the California Environmental Quality Act (CEQA; Pub. Resource Code, § 2100 et seq.).

        In the instant writ proceeding, petitioners contend the permit approvals violate the Sonoma County Local Protection Plan and, specifically, a county ordinance, because the expansion will entail some rechanneling of an ephemeral watercourse called Spring Branch.  Under that ordinance, modification of a marsh watercourse is allowed only if no

1

"reasonable alternative" exists. Petitioners claim the Commission could have, and should have, approved a smaller expansion that would not impinge on the intermittent watercourse. The trial court agreed, ruling no substantial evidence supports the Commission's determination that a smaller alternative is not economically reasonable. The Commission and real party have appealed. We reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Potrero Hills Landfill is located in the upland, grassland area—or "secondary management area"—of the Suisun Marsh. The landfill site is currently 320 acres in size. The expansion, as proposed in 2003, would allow an increase in fill height and also add 260 acres of adjoining property to the site—extending the life of the landfill another 35 years. The proposed expansion would also have a number of environmental impacts, including impinging on and requiring the alteration of a portion of an intermittent watercourse, Spring Branch. Decades ago, relocation of another portion of Spring Branch was deemed consistent with applicable laws, and permitted in connection with the landfill.

*County's Approval of Permits*

In early 2003, the county gave notice it would prepare an environmental impact report (EIR) for the proposed landfill expansion. The draft EIR, published later that year, concluded relocating a portion of the Spring Branch watercourse would not have a significant environmental impact if certain mitigation measures were adopted.[1] In part, this conclusion was based on a finding the watercourse was then "devoid of riparian vegetation." The draft EIR also concluded the project was consistent with the Suisun

---

[1] The draft EIR described Spring Branch as "[a]n ephemeral surface water runoff channel."

2

Marsh Preservation Act of 1977 (Pub. Res. Code, § 29000 et seq.)[2] and the Solano County Local Protection Plan.

The draft EIR evaluated one alternative to the proposed expansion project: increasing the height of the landfill, without increasing the footprint. This alternative was rejected because it would still require excavation of the adjacent land, would not appreciably reduce environmental impacts, and would, with a significantly reduced fill capacity, undermine the project goals. Offsite alternatives were not considered in detail, since any new site was likely to raise issues similar to those facing the proposed expansion.

Two years later, in September 2005, after receiving and responding to comments, the county certified a final EIR and issued a use permit and marsh development permit for the proposed expansion (Nos. U-88-33 and MD-88-09).

Under the Suisun Marsh Preservation Act, a decision by a local government to issue a marsh development permit can be challenged in two ways. One provides for tiered agency, and then court review. The challenger first appeals to the San Francisco Bay Conservation and Development Commission, the body with ultimate responsibility for implementing the Act. (§§ 29106, 29504, subd. (a).) If the challenger remains aggrieved after the Commission's decision on appeal, the challenger "may seek judicial review . . . by filing a petition for a writ of mandate in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure within 60 days after such decision or action has become final." (§ 29602.) The other avenue allows for direct review by the courts. The challenger may seek "judicial review of any decision made or any action taken pursuant to this division by a local government that is implementing the certified local protection program, or any component thereof, whether or not such decision or

---

**2** All further statutory references are to the Public Resources Code unless indicated.

3

action has been appealed to the commission, by filing a petition for writ of mandate in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure within 60 days after the decision or action has become final." (§ 29603.)

Petitioner David Tam took both paths.

### *The Prior "Protect the Marsh" Writ Proceeding*

In October 2005, Tam and others filed a writ proceeding in Solano County Superior Court, *Protect the Marsh v. County of Solano* (case No. FCS026839). The first amended petition not only challenged the adequacy of the county's EIR (first cause of action) it, in separate causes of action, sought to invalidate the marsh development permit as noncompliant with the county's general plan (second cause of action) and zoning regulations (third cause of action), and the Suisun Marsh Preservation Act, Suisun Marsh Protection Plan, and Solano County Local Protection Plan (fourth cause of action). Among other things, the amended petition specifically alleged the alteration of Spring Branch was inconsistent with the local protection plan. As required by section 29603 (authorizing direct judicial review of a marsh permitting decision), Tam and the other petitioners in *Protect the Marsh* gave the Commission notice of the writ proceeding. The Commission could have sought to intervene (§ 29603), but apparently did not.

The trial court issued its decision in the prior *Protect the Marsh* writ proceeding on February 26, 2007. It ruled two findings in the EIR, unrelated to Spring Branch, were not supported by substantial evidence. It also faulted the EIR for not considering alternative landfill sites outside of the marsh. The court rejected the remainder of the petitioners' claims, also ruling that the modification of the Spring Branch watercourse was not inconsistent with any governing plan or regulatory requirement. This writ decision was not appealed.

During 2007 and 2008, the county revised, re-circulated, and re-certified the EIR. The revised EIR included a 50-page discussion of, and reasons for rejecting, 20 non-marsh locations for a new landfill in lieu of expanding the existing landfill. The trial

4

court determined the discussion and rejection of one of the locations was inadequate and therefore refused to approve the county's return to the writ.

The county spent another year making additional revisions, and on November 3, 2009, the trial court approved its return to the writ. SPRAWLDEF, which had not been a party to the writ proceeding, purported to appeal this order, but its appeal (No. A127688) was dismissed for lack of standing.

### *The Appeal to the Commission*

The same month Tam and others filed the *Protect the Marsh* writ proceeding, he and others also filed administrative appeals of the marsh development permit with the Commission. Although Tam did not contend the relocation of the Spring Branch watercourse was inconsistent with applicable state and local laws, other appellants did.

In December 2005, the Commission concluded the appeals raised substantial issues, triggering de novo review of the county's approval of the marsh development permit. (See §§ 29523, 29524.) Accordingly, in addition to considering the existing administrative permit record and a wide range of documents related to other agencies' analysis and approval of the project,[3] the Commission undertook its own investigation of the project and retained a panel of scientists to prepare a report on ecological impacts to the marsh. The nearly 200-page report was completed in 2007.

Assessing Spring Branch, the 2007 scientists' report found the intermittent watercourse had a bed and banks. It also found wetland vegetation within the watercourse, differing from the 2005 hydrology report prepared in connection with the

---

[3] The Commission received copies of reports and analyses submitted to and generated by numerous governmental bodies related to the expansion project, including: the county's EIR and related documents; reports to the U.S. Army Corps of Engineers on project alternatives, impacts, and mitigation measures; and voluminous materials from the Bay Area Quality Management District, California Department of Fish and Game, California Integrated Waste Management Board, California Regional Water Quality Control Board, and U.S. Fish and Wildlife Service.

county's EIR and other reports submitted to the Commission by real party. The scientists' report, which the Commission ultimately credited, recommended modified mitigation measures, including having the rechanneled watercourse more closely mimic the native one, employing better monitoring of water quality, and seeking preservation of similar areas within the Spring Branch watershed. In light of the new information and proposals in connection with Spring Branch, the Commission asked real party to explore reducing the size of the expansion.

The size of the landfill was addressed in a 2009 report on alternatives real party prepared and submitted to the Army Corps of Engineers, whose approval was also required for the proposed expansion. The report was eventually filed with the Commission and part of the universe of materials referenced by staff during the administrative proceeding.

The 2009 report analyzed 16 off-site alternatives and four on-site alternatives and compared them to the proposed expansion which would increase the capacity of the landfill by about 41.43 million tons (61.6 million cubic yards), at a unit cost of $2.66 per ton ($110 million), and extend the life of the landfill by 35 years. The first on-site alternative increased only the height of the landfill. This would increase the capacity by only 8.04 million tons (12 million cubic yards), at a unit cost of $3.04 per ton ($24.7 million), and add only seven years to the life of the landfill. As had been noted in the EIR, this alternative would likely require excavation of soil surrounding the Spring Branch watercourse, creating some environmental impacts in the area. The second on-site alternative called for a 112-acre (rather than 167-acre) expansion of the landfill footprint, without additional height. This would increase the landfill capacity by 10.08 million tons (15 million cubic yards), at a cost of $8.54 per ton ($86.1 million), and add about 8.7 years of life. It would avoid 0.2 acres of the Spring Branch watercourse, in addition to preserving other wetlands. A third on-site alternative was similar, adding 105 acres to the landfill footprint. This would increase capacity by 6.8 million tons (10.1

6

million cubic yards), at a cost of $11.53 per ton ($77.2 million), and extend the life of the landfill by approximately 5.9 years. It would not impact the Spring Branch watercourse. A fourth on-site alternative moved the expansion some 3,500 feet from the existing landfill, resulting in two fill mounds, rather than one expanded mound. This would increase the landfill capacity by 9.9 million tons (15 million cubic yards), at a cost of $9.82 per ton ($97 million) and extend the life of the landfill by 8.6 years. This alternative would not impact Spring Branch, but would impact other wetlands. The report rejected each of these alternatives as too costly on a per unit basis, concluding any alternative costing 50 percent more per ton than the proposed expansion was not economically practicable.

The Commission, itself, engaged in direct dialogue, through numerous e-mail exchanges, with real party about another alternative that would not encroach on Spring Branch. This alternative would add 127 (rather than 167) acres to the landfill site, all north of Spring Branch.[4] It would reduce expansion capacity by about 30 percent, shorten the lifespan of the landfill by 10 years, and reduce overall gross revenues by 45 percent. There would not, however, be a commensurate reduction in investment costs. Because such costs are largely fixed, there would only be a 10 percent reduction in costs. Nor was there a direct correlation between the percentage reduction in the acreage (24%) and reduction in capacity (30%) due to "the nature of landfill engineering" and, specifically, that the land around Spring Branch is capable of supporting a greater volume of landfill than other areas. Real party therefore advised the Commission the economic consequences of the 127-acre alternative will be " 'of such a magnitude that the business decision to expand cannot be justified.' "[5]

---

[4] The Commission's report mistakenly refers to this alternative as involving 117 acres. It is clear from the record, however, the alternative involved adding 127 acres to the landfill footprint.

[5] Given the discussion of this 127-acre alternative, petitioners are incorrect in asserting "[t]here was no specific alternative described" by the Commission.

7

In answer to further Commission inquiries, real party explained its profit margins were typically around 9 percent, giving it only a small margin of error for operating new or expanded sites. Accordingly, without capacity for 54 to 59 million cubic yards of fill in the expansion area, the project would not be "financially viable." Real party declined to provide further financial detail, viewing the information as confidential.

The Commission concluded the 127-acre alternative was not economically realistic. Its rejection of this reduced-sized alternative, however, was not based solely on economics. The Commission also pointed out: (1) even with a smaller expansion plan, Spring Branch would need a number of man-made modifications to protect it from natural erosion and landfill impacts; and (2) rechanneling the watercourse would actually improve water quality at the marsh. The Commission concluded: "Based upon the information available to the Commission, the information and statements made by [real party] in response to staff requests to evaluate the feasibility of a smaller landfill expansion project, and the information provided in the [draft EIR] that with mitigation measures, diverting Spring Branch . . . would not have a significant environmental impact on surface water quality, the Commission finds that restricting the project to avoid Spring Branch . . . is not a reasonable alternative . . . ."

The Commission did, however, on the basis of community input and for aesthetic reasons, reject the increased landfill height the county had allowed. Accordingly, the height, in both the new and old portions of the landfill, would remain capped at 220 feet above sea level, unless real party could demonstrate the fill will not be visible from preset vantage points. This modification reduced the capacity of the planned expansion by approximately 10 percent.

On October 21, 2010, the Commission voted 15-4 to reject the administrative appeals, and determined that the landfill expansion, as modified by the Commission, was consistent with the Suisun Marsh Preservation Act and the Solano County Local Protection Plan. Pertinent here, the modified marsh development permit allowed for

8

replacement of portions of the Spring Branch watercourse with a 6,500-foot underground pipeline and a five-foot deep, 30-foot wide surface channel.

### *This Writ Proceeding*

Two months later, on December 17, 2010, Tam and SPRAWLDEF filed the instant writ proceeding—separate from the, by then, already resolved *Protect the Marsh* proceeding—in San Francisco Superior Court pursuant to section 29602, challenging the Commission's approval of the marsh development permit and, specifically, its decision to allow alteration of the Spring Branch watercourse. Petitioners claim no substantial evidence supports the Commission's determination there are no reasonable alternatives that would preserve Spring Branch and the Commission thereby violated Solano County Ordinance section 31-300, which prohibited filling natural channels in the marsh unless there are no reasonable alternatives. Four months later, the San Francisco Superior Court transferred the case to Solano County.

On November 29, 2012, the same court that decided the *Protect the Marsh* writ proceeding (and ultimately approved the EIR and rejected claims about the modification of Spring Branch) issued a writ of mandate on the sole ground the Commission's determination that the 127-acre, reduced-size alternative was not economically reasonable was not supported by substantial evidence. The court did not address any other issue, including whether there was evidence in the record the alternative was unreasonable for other reasons.

### DISCUSSION

### *The Suisun Marsh Act and Standard of Review*

The Legislature created the San Francisco Bay Conservation and Development Commission in 1965 and gave it planning and permitting authority over projects affecting the San Francisco Bay. (*People ex rel. San Francisco Bay Conservation & Development Commission v. Town of Emeryville* (1968) 69 Cal.2d 533, 539; *Mein v. San Francisco Bay Conservation etc. Com.* (1990) 218 Cal.App.3d 727, 732.) The Commission's

9

jurisdiction over the bay includes "all sloughs; 'marshlands' extending from a seaward line of 'mean high tide' of the bay to a landward line five feet above mean sea level; 'tidelands' lying between mean high tide and mean low tide; and 'submerged lands' lying below mean low tide." (*Littoral Development Co. v. San Francisco Bay Conservation etc. Com.* (1994) 24 Cal.App.4th 1050, 1053; Gov. Code §§ 66604, 66610.)

The Suisun Marsh Preservation Act is intended to protect valuable natural resources within the marsh and invests the Commission with ultimate authority over its implementation. (See §§ 29002, 29003, 29005, 29106, 29200, 29504, subd. (a).) Under the act, the marsh consists of "primary" water-covered areas and lowland grasslands, and upland "secondary" areas. (§§ 29101–29103.) For developments in secondary areas— such as the landfill expansion at issue here—a marsh development permit must be obtained "from the local government having jurisdiction over the land in which the proposed development is to occur." (§ 29502, subd. (a).)

A local government may issue a marsh development permit "only if it finds that the proposed development" is consistent with or "in conformity with" the adopted "local protection program." (§ 29503, subd. (a).) The local protection program is defined as "those provisions of general or specific plans; ordinances; zoning district maps; land use regulations, procedures, or controls; or any other programs, procedures, standards, or controls that are adopted, undertaken, or carried out by local governments, districts, or the Solano County Local Agency Formation Commission in and adjacent to the marsh, are submitted by the county to the commission . . . , and meet the requirements of, and implement, this division and the Suisun Marsh Protection Plan at the local level." (§ 29111.)

As we have discussed, the act permits challenges to permitting decisions to be brought by way of a "a petition for a writ of mandate in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure." (§ 29602.) "Under subdivision (b) of Code of Civil Procedure section 1094.5, an abuse of discretion is established and a writ

10

of mandate should issue if an agency either failed to proceed in the manner required by law, did not support its decision with adequate findings, or if its findings are not supported by the record." (*Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908, 919 (*Save San Francisco Bay*).) The scope of our review of a challenged permitting decision is the same as that of the trial court. (See *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 921–922 (*Ross*); *Advanced Choices, Inc. v. State Dept. of Health Services* (2010) 182 Cal.App.4th 1661, 1669.)

An "agency's findings and actions are presumed to be supported by substantial evidence. [Citations.] A person challenging an administrative determination bears the burden of showing the agency's findings are not supported by substantial evidence. [Citations.] When reviewing the agency's determination, the court examines the whole record and considers all relevant evidence, including that which detracts from the administrative decision." (*Ross, supra,* 199 Cal.App.4th at p. 921.) " 'Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' " (*Id.* at p. 922; see also *Save San Francisco Bay*, *supra*, 10 Cal.App.4th at p. 930, fn. 7 [substantial evidence test generally applies to Commission's findings on challenge under Code of Civil Procedure section 1094.5].)[6]

---

[6] As a preliminary matter, the county, which filed an amicus brief in support of the Commission, asserts SPRAWLDEF lacks standing to challenge the Commission's approval of the modified marsh development permit. While SPRAWLDEF did not appeal the county's approval of the permit to the Commission, it nevertheless participated in the administrative proceeding by filing a letter in support of the appeals. It subsequently joined with Tam to challenge the permit in the instant writ proceeding, and no party has ever challenged its standing to do so. Given SPRAWLDEF's participation

11

### Substantial Evidence Supports the Commission's Action

While petitioners have cited to a variety of provisions of the Suisun Marsh Preservation Act and the county's Local Protection Program, at the end of the day, their challenge to the Commission's approval of a marsh development permit is grounded on one Solano County ordinance, section 31-300.[7] Under section 31-300, a grading ordinance, "every effort must be made to preserve natural channels and drainage ways" (§ 31-300, subd. (n)) and, more concretely, that filling, grading, or excavating watercourses "shall be allowed only where no reasonable alternative is available, and where allowed, shall be limited to the minimum amount necessary" (*id.*, subd. (o)). Petitioners claim no substantial evidence supports the Commission's finding that the 127-acre alternative is not economically reasonable.

In arguing whether, from an economic perspective, there was "no reasonable alternative" under section 31-300, petitioners and respondents alike invoke CEQA and its concept of whether an alternative is or is not feasible.[8] "Feasible" is defined in CEQA as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (See § 21061.1.) Under CEQA, governments are to choose "feasible" alternatives and "feasible" mitigation measures to lessen the significant environmental impacts of

in the administrative proceeding and the language and context of section 29602, we conclude it has standing. No question has been raised as to Tam's standing.

[7] At oral argument, the Commission suggested petitioners did not invoke this ordinance in the trial court. That is incorrect. Petitioners expressly cited the ordinance in their trial court memorandum of points and authorities, and the Commission, in turn, addressed the ordinance in its opposition memorandum. The Commission had cited and applied the ordinance during the administrative proceedings and referenced it in the marsh development permit.

[8] Before the Commission, as well, real party cited to CEQA's feasibility language in discussing the proposed expansion and the 127-acre alternative. No party offered an alternative method of analysis in either the administrative proceedings or the trial court. Nor have they done so on appeal.

12

projects. (§§ 21002, 21081.) While the Marsh Preservation Act defines "feasible" identically to CEQA (§ 29115), it does not, itself, appear to employ the term in any substantive way.

We conclude employing CEQA's definition of "feasible," and the CEQA case law concerning economic infeasibility, is an appropriate approach since the term embraces the concept of reasonableness. (See *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565, 574 [under CEQA, " '[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason' "]; *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1001 ["feasibility" under CEQA encompasses " ' "desirability" to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors' "].)

"The 'feasibility of . . . alternatives must be evaluated within the context of the proposed project. "The fact that an alternative may be more expensive or less profitable is not sufficient to show that the alternative is financially infeasible. What is required is evidence that the *additional* costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project." ' [Citations.] Thus, when the cost of an alternative exceeds the cost of the proposed project, 'it is the magnitude of the difference that will determine the feasibility of this alternative.' " (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 883.) Ultimately, "the question is . . . whether the marginal costs of the alternative as compared to the cost of the proposed project are so great that a reasonably prudent [person] would not proceed with the [altered project]." (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 600 (*Woodside*).)

For example, in *Woodside* the proposed project was replacing an old, historic residence with a new one. (*Woodside*, *supra*, 147 Cal.App.4th at pp. 591, 598.) The town rejected two rehabilitation alternatives as infeasible based on their cost—between

13

$4.9 million and $10 million—without obtaining *any* evidence about the cost of constructing the proposed new home. Without any comparative numbers, it was not possible to determine the feasibility of the rehabilitation alternatives. (*Id.* at p. 599.) However, the conclusion was different for two other alternatives calling for relocation and renovation of the old residence *in addition to* building a new home. The appellate court held a $5 million price tag for relocation and renovation, apart from the cost of the new home, "supports a reasonable inference that these alternatives are not economically feasible." (*Id.* at p. 599, fn. 6.)

*Woodside* does not require any particular economic analysis or any particular kind of economic data, but requires generally "some context" that allows for economic comparison. (*Woodside*, *supra*, 147 Cal.App.4th at pp. 600–601.) The appellate court suggested that to reject the rehabilitation-only alternative, for example, it might have been "sufficient to show that the cost of rehabilitating the existing house would be significantly more than the cost of building a new home of a quality appropriate to the area, or that the cost of the proposed alternative is so great that the property owner could never expect to recover the investment on resale." (*Id.* at pp. 600–601.) The court declined to limit the ways in which economic infeasibility could be shown, noting they could be numerous and vary depending on the circumstances. (*Id.* at p. 601 ["It is not necessary to identify every conceivable means of establishing the lack of feasibility . . . ."].)

In *Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1180 (*Goleta Valley*), the county agency approved a 400-room hotel over an alternative calling for a reduced-size, 340-room hotel. Although the administrative record contained estimates of annual revenue, infrastructure costs, and overall costs for the proposed 400-room project, it did not contain these figures for the 340-room alternative. (*Id.* at pp. 1180–1181 & fn. 3.) Thus, as in *Woodside*, meaningful comparison was not possible. The appellate court held the approving authority could not simply surmise that project

14

costs per room would increase to the point that proceeding with the alternative would be economically impractical. (*Goleta Valley*, at p. 1181.)

In contrast, *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490 (*Sierra Club*), concluded the approving authority had substantial evidence to reject alternatives as economically infeasible. In *Sierra Club*, a winemaker's letter explaining the " 'project is the only place on the property to construct a facility of the size and layout that we must have to meet our fundamental business needs of operational efficiency and consolidation, which is the justification for this large and expensive project' " was a "persuasive argument" a reduced development alternative was not feasible. (*Sierra Club*, *supra*, 121 Cal.App.4th at pp. 1506, 1508.) "Although the record certainly could have included more evidence on the point," the court concluded there was sufficient evidence to support rejection of smaller alternatives. (*Id.* at p. 1508.) "It is of no matter that the evidence of economic infeasibility here was far less detailed than [in other cases]" as "[t]he question is simply whether the agency's finding was supported by substantial evidence." (*Ibid.*)

The record before the Commission here is at least commensurate with that in *Sierra Club*. With respect to the 127-acre alternative the Commission identified in 2010, real party submitted a chart comparing salient data *both* for the landfill expansion as proposed and the posited alternative. This showed the alternative would result in a 30 percent reduction in capacity and a 45 percent reduction in revenue. Real party also explained why the reduction in capacity figure was not, as a matter of percentages, commensurate with the 24 percent reduction in acreage—because, given "the nature of landfill engineering," the land around Spring Branch is capable of supporting a greater volume of landfill than other areas. Real party also explained why there would not be a correlative 45 percent reduction in costs, but only a 10 percent reduction—because many capital costs would remain fixed or vary only slightly with the size change, and, further, there would be a significantly reduced time period to recover costs given the reduced life of the landfill.

15

Accordingly, real party did not simply baldly assert the 127-acre alternative was not economically feasible. It provided comparative figures and explained why an expansion that did not have 54 to 59 million cubic yards of capacity was not financially viable. Thus, real party provided the Commission with "some context" to permit the Commission to assess the economic feasibility of the 127-acre alternative. (*Woodside*, *supra*, 147 Cal.App.4th at pp. 600–601.)

In addition, the 2009 report real party prepared for the Army Corps of Engineers was part of the administrative record. While the Commission did not specifically refer to the 2009 report in its decision rejecting the appeals and approving a modified marsh development permit, there is no dispute the report was part of the record and included within the materials referenced by staff. We must therefore assume it was within the universe of information the Commission considered. (See *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 517.)

As we have discussed, this report examined, in considerable detail, four other on-site alternatives involving lesser changes to the Spring Branch watercourse. The report compared, side by side, the per unit cost, capacity, and life of the landfill, for the proposed expansion and the alternatives. The costs per ton of the alternatives ranged from $3.04 to $11.53, compared to $2.66 for the project as proposed. The capacities ranged from 10.1 million cubic yards to 15 million cubic yards, compared to 61 million cubic yards for the project as proposed. And the life of the landfill ranged from 5.9 to 8.7 years, compared to 35 years for the project as proposed. The disparity in these figures is so great it amply supports the conclusion a reduced-size alternative of the magnitude necessary to avoid implicating Spring Branch was not economically feasible.

Thus, the record in this case is not close to that in *Woodside* and *Goleta Valley* in which the financial data was so lacking no economic comparison at all could be made between the project as proposed and the alternatives. Such comparison is possible here,

16

and a reasonable person could have reached the conclusion the Commission reached. That effectively ends our inquiry. (See *Ross*, *supra*, 199 Cal.App.4th at p. 922 [we " 'may reverse [the Commission's] decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it' "].) There is no basis for the trial court's view that real party had to produce significantly more detailed economic data showing net profit figures. As we have discussed, the courts have eschewed requiring any particular economic showing, and have, instead, recognized that what is sufficient will depend on the particular context. In this case, the Commission had an adequate record before it to fairly determine the smaller alternatives were not economically reasonable.

There is no merit to petitioners' assertion the economic information in the record about the landfill expansion as proposed and the alternatives, should be discounted or ignored because it was provided by real party. The Commission could have, of course, rejected the evidence, had it found it not credible. It was also within the province of the Commission, however, to accept the information as accurate and relevant. (See *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 684 [agency may rely on allegedly "self-serving" study]; *Mahdavi v. Fair Employment Practice Com.* (1977) 67 Cal.App.3d 326, 340 ["self-serving statements by University employees" were evidence].)

Furthermore, despite petitioners' contrary assertion, the Commission did not reject the reduced-size alternative on economic grounds alone. If an alternative is infeasible for noneconomic reasons, such as a failure to achieve project goals, it can be rejected on that basis without any economic feasibility analysis. (See *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1462, fn. 13.) All of the on-site alternatives examined in the 2009 report prepared for the Army Corp of Engineers would

17

reduce future capacity below that required by state regulations.[9] The 127-acre alternative, in turn, also involved a significant reduction in capacity, shortening the anticipated lifespan of the landfill by a decade, and would still have required a number of modifications to the Spring Branch watercourse. Ultimately, the Commission stated it had reviewed all the "information available to [it], the information and statements made by [real party] in response to staff requests to evaluate the feasibility of a smaller landfill expansion project, and the information provided in the [draft EIR] that with mitigation measures, diverting Spring Branch . . . would not have a significant environmental impact on surface water quality" and concluded "restricting the project to avoid Spring Branch . . . is not a reasonable alternative." Substantial record evidence supports this manifestly multi-faceted determination.

Given our conclusion that substantial evidence supports the Commission's decision and the trial court's judgment invalidating it must therefore be reversed, we do not address other arguments made by the Commission, real party, and amici, or the responses to those arguments by petitioners. This includes the real party's assertion section 29409 exclusively governs the proposed expansion. This statute provides: "Notwithstanding the policies of the protection plan, the local protection program may not preclude the future development of a new solid waste disposal site in the Potrero Hills if it can be demonstrated that the construction and operation of solid waste facilities at that site would not have significant, adverse ecological or aesthetic impacts on the marsh." (§ 29409.) We likewise do not address petitioners' newly fashioned response to this argument—that "alternatives or no alternatives, the 'substantial adverse ecological

_____

[9] Under applicable regulations, a county's waste management plan "shall demonstrate that there is a countywide or regionwide minimum of 15 years of combined permitted disposal capacity through existing or planned solid waste disposal and transformation facilities or through additional strategies." (Cal. Code Regs. tit. 14, § 18755(a).) The greatest lifespan of any of the alternatives addressed in the 2009 report was 8.7 years.

18

impacts' to Spring Branch Creek prohibit[] the current project." Petitioners never advanced such a claim in the trial court (their petition focused on the allegedly flawed alternatives analysis), and to the extent they may be asserting it now as an independent ground for invalidating the Commission's decision they have forfeited it. (See *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 211, 215 [such an "omission" by a petitioner attempting to support a trial court's issuance of a writ "would be grounds to consider the issue forfeited"]; *A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648.) In any event, the Commission's finding of no substantial adverse impacts, as mitigated and modified after input from scientists and the community, is supported by substantial evidence. We also do not address whether the instant writ proceeding is barred by the doctrine of res judicata based on the trial court's unappealed judgment in the *Protect the Marsh* writ proceeding. We note, however, that while Tam was a party to that proceeding, SPRAWLDEF was not and thus would not be subject to this preclusion doctrine. Finally, we do not address the County of Solano's argument, in its amicus brief, that Ordinance section 31-300 has been misinterpreted by the parties and trial court and, as a mere grading ordinance, does not authorize or contemplate consideration of project alternatives, but only alternative construction methods in constructing an already-approved project.

**DISPOSITION**

The judgment of the trial court is reversed, and the court is directed on remand to enter a judgment denying the petition for writ of mandate.  Appellants to recover costs on appeal.

 

 

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Becton, J.\*

---

\* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SPRAWLDEF et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., <br><br>     Defendants and Appellants, <br><br> WASTE CONNECTIONS, INC., <br><br>     Real Party in Interest and Appellant. | A137619 <br><br> (Solano County <br> Super. Ct. No. FCS039863) <br><br><br> ORDER CERTIFYING OPINION FOR PUBLICATION <br><br>    [NO CHANGE IN JUDGMENT] |

THE COURT:

    The opinion in the above-entitled matter filed on April 29, 2014, was not certified for publication in the Official Reports. After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated:

                                        _____

                                        Margulies, J.

1

Trial Judge:                                       Honorable Paul Lloyd Beeman

Trial Court:                                     Solano County Superior Court


The Smith Firm and Kelly T. Smith for Plaintiffs and Respondents.

Kamala D. Harris, Attorney General, John A. Saurenman, Senior Assistant Attorney General, Christiana Tiedemann, Supervising Deputy Attorney General for Defendants and Appellants.

Beveridge & Diamond, Lily Chinn, Gary J. Smith, Zachary M. Norris, and James B. Slaughter and Law Offices of Scott W. Gordon and Scott W. Gordon for Real Party in Interest Waste Connections, Inc.

Somach Simmons & Dunn, Richard S. Deitchman and Nicholas A. Jacobs for Suisun Resource Conservation District as Amicus Curiae on behalf Defendants and Appellants.

Astor & Kingsland and John Kelly Astor for California Refuse Recycling Council as Amicus Curiae on behalf of Defendants and Appellants.

Robert Paul for Napa-Vallejo Waste Management Authority as Amicus Curiae on behalf of Defendants and Appellants.

Dennis Bunting, County Counsel, Azniv Darbinian, Assistant County Counsel and James W. Laughlin, Deputy County Counsel for the County of Solano as Amicus Curiae on behalf of Defendants and Appellants.