Filed 4/14/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| JOHN D. SWEENEY et al.,<br><br>     Plaintiffs and Respondents,<br>v.<br><br>SAN FRANCISCO BAY<br>CONSERVATION AND<br>DEVELOPMENT COMMISSION et<br>al.,<br><br>     Defendants and Appellants. | A153582<br><br>(Solano County<br>Super. Ct. No. FCS048136)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on February 18, 2021, be further modified as follows:

At page 3, in the final statutory citation in the paragraph that begins on page 2, "66637" is deleted, and "66638" is inserted in its place.

At page 3, in the case citation at the end of the first full paragraph, "see also (*Sustainability*" is deleted, and "see also *Sustainability*" is inserted in its place.

At page 7, in the second citation in the first full paragraph, "Pub. Resources Code, § 29601" is deleted, and "Pub. Resources Code, § 29602" is inserted in its place.

At page 9, in the last citation of the paragraph that begins on page 8, "29520" is deleted, and "29501, subd. (b)" is inserted in its place.

1

At page 9, the second sentence of the first full paragraph is revised to read: "The trial court set aside the BCDC Order because it found Respondents were exempt from the marsh development permit requirement based on the "repair exception" in Public Resources Code section 29508, subdivision (b) (Section 29508(b)) and the exception for work consistent with a site's component of the local protection program in Public Resources Code section 29501.5 (Section 29501.5)."

At page 11, the first full sentence on the page is revised to read: "Under this provision, work undertaken at a site that is consistent with a site's component of the local protection program, or IMP, does not require a marsh development permit."

At page 11, the first sentence of the first full paragraph is revised to read: "The parties agree that the Site's component of the local protection program is the Mason IMP that was certified in 1984."

At page 12, the last sentence of the first full paragraph is revised to read: "Many, if not most, of Sweeney's changes had no reasonable connection to the management contemplated in the Mason IMP, and thus were inconsistent with the Site's component of the local protection program."

At page 13, the fifth sentence of the second full paragraph is revised to read: "BCDC's Enforcement Committee determined that the placement of fill to close each of the tidal breaches of the former levee should be treated as single violation rather than seven and on this basis reduced the proposed penalty to $772,000, which was the penalty ultimately adopted by BCDC."

At page 14, in the first sentence of the second full paragraph, "Mc-Ateer Petris" is deleted, and "McAteer-Petris" is inserted in its place.

At page 16, the fourth sentence of the first full paragraph is revised to read: " "In determining whether the decision is supported, we require

2

findings to 'bridge the analytical gap between the raw evidence and ultimate decision or order.' "

At page 21, in the first citation in the paragraph that begins on page 20, "11332" is deleted, and "11322" is inserted in its place.

At page 24, in the third citation in the third full paragraph, "11227" is deleted, and "11327" is inserted in its place.

At page 25, in the first citation on the page in the paragraph that begins on page 24, "11229" is deleted, and "11329" is inserted in its place.

At page 27, in the paragraph that begins on page 26, the bracketed statement following the citation to *Pleasanton*, *supra*, 211 Cal.App.4th at p. 533, is revised to read: "[no authority says "agency decisionmaking body is precluded from soliciting or receiving a written analysis and recommendation from the agency's prosecuting attorney delivered to it as part of a public agenda packet along with the adversary's opposing analysis and recommendation"]"

At page 29, the third sentence in the second full paragraph is revised to read: "There is no requirement that hearings last for any particular amount of time (see Cal. Code Regs., tit. 14, § 11327), and reasonable time limitations are necessary and inevitable."

At page 30, in the first citation on the page in the paragraph that begins on page 29, "11335" is deleted, and "11332" is inserted in its place.

Dated: _____                    _____

                                          Fujisaki, Acting P.J.

3

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN D. SWEENEY et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., <br><br>     Defendants and Appellants. | A153582 <br><br> (Solano County <br> Super. Ct. No. FCS048136) |

This is the first of three companion cases concerning Point Buckler (the Site), a 39-acre tract located in the Suisun Marsh, which John Sweeney purchased and subsequently transferred to Point Buckler Club, LLC (collectively Respondents).[1]  For months, Respondents undertook various projects at the Site, converting it from tidal marsh to a mostly dry island, and subsequently marketed it as a kiteboarding recreational area.  In this case, the San Francisco Bay Conservation and Development Commission (BCDC or Commission) issued an order to Respondents, directing them to cease and

---

[1]  The other two companion cases (A153583 & A153585) concern actions taken against Respondents by the California Regional Water Quality Control Board, San Francisco Bay Region.  We address the issues raised in those appeals in a separate decision also filed today.

desist from placing fill within the Site and from engaging in any development activities without obtaining the necessary marsh development permit. BCDC's order assessed Respondents a civil penalty of $772,000 for violations of the McAteer-Petris Act and the Suisun Marsh Preservation Act. Respondents successfully challenged BCDC's order in a writ proceeding which set it aside in its entirety.  We reverse.

## BACKGROUND

San Francisco Bay's wetlands "not only serve as habitat for fish, fowl and a rich abundance of animal wildlife but also enhance water quality by absorbing and filtering pollutants, reduce the destructiveness of floods by slowing their flow, increase water supply by recharging aquifers, prevent seawater intrusion by acting as a freshwater barrier, and control erosion by preventing soil and silt from moving downstream toward the ocean.  The bay and delta, especially Suisun Marsh, contain the state's largest expanse of wetlands and yet they constitute only a fraction of the approximately 5 million acres that originally existed in California.  Some 450,000 acres remain in the state, reflecting a loss of more than 90 percent, the greatest decline of wetlands in the nation." (Hundley, The Great Thirst, Californians and Water: A History, University of California Press, Revised Edition (2001) p. 399.)

The Site is an approximately 39-acre tract located in Suisun Marsh at the south end of Grizzly Bay.

In response to broad public interest in the San Francisco Bay as a unique and valuable resource, in 1965, the Legislature enacted the McAteer-Petris Act (Gov. Code, § 66600–66694) in order "to create a politically-responsible, democratic process by which the San Francisco Bay and its shoreline can be analyzed, planned, and regulated as a unit."  (Gov. Code, §

2

66600.) The law created BCDC, a 27-member entity, with jurisdiction over the waters of San Francisco Bay and the surrounding shoreline, as well as portions of other waterways and uplands, including the Suisun Marsh. (Gov. Code, § 66620.) BCDC is empowered to issue or deny permits for any proposed project that involves placing fill, extracting materials or making any substantial change in use of any water, land or structure within the area of BCDC's jurisdiction. (Gov. Code, §§ 66620, 66604.) BCDC also holds the power to order a person to cease and desist when after a public hearing it determines that a person has undertaken, or is threatening to undertake, activities that require a permit without securing one. (Gov. Code, § 66637.)

In 1977, the Legislature enacted the Suisun Marsh Preservation Act (Preservation Act). (Pub. Resources Code, §§ 29000–29612.) The Preservation Act protects the valuable natural resources within the Marsh and invests BCDC with the ultimate authority over its implementation. (Pub. Resources Code, § 29000 et seq.; see also (*Sustainability, Parks, Recycling & Wildlife Legal Defense Fund v. San Francisco Bay Conservation and Development Commission* (2014) 226 Cal.App.4th 905, 915–916 (*Sustainability*).)

Pursuant to the Preservation Act, BCDC adopted the Suisun Marsh Protection Plan (Protection Plan). (Pub. Resources Code, § 29113, subd. (a).) It also certified the "local protection program," which refers to "those provisions of general or specific plans; ordinances; zoning district maps; land use regulations, procedures, or controls; or any other programs, procedures, standards, or controls that are adopted, undertaken, or carried out by local governments, districts, or the Solano County Local Agency Formation Commission in and adjacent to the marsh, are submitted by the county to the commission . . . , and meet the requirements of, and implement, this division

3

and the Suisun Marsh Protection Plan at the local level." (Pub. Resources Code, §§ 29111, 29400–29424.)

The local protection program has a general management program prepared by the Suisun Resource Conservation District and approved by BCDC. (Pub. Resources Code, §§ 29401, subd. (d), 29412.5.) This local protection program includes an individual water management program, or IMP, for each managed wetland in private ownership within the primary management area of the Marsh and specified "all necessary development related to such management." (Pub. Resources Code, § 29412.5.) The Site has an IMP—the Annie Mason Point Club IMP (the Mason IMP)— that was certified by BCDC in 1984.

In 2011, Sweeney bought the Site. In the following years, he undertook a number of unpermitted construction and development projects there, which included restoring the Site's exterior levee which had been breached in multiple places. These efforts largely converted the property from tidal marsh to a mostly dry island. In October 2014, Sweeney transferred title to the Point Buckler Club, LLC (Point Buckler Club), for which he was the manager and principle shareholder. He also began operating the Site as a private recreational area for kiteboarding.

In November 2014, BCDC staff was concerned about unauthorized work at the Site and conducted a site visit. During the visit, BCDC staff provided Sweeney with the Mason IMP.

Following the visit, BCDC staff notified Sweeney in a January 30, 2015, letter of several violations. Staff explained the regulatory framework governing the Suisun Marsh and the Site. Based on available information, the history of the Site, and the recent Site visit, BCDC staff observed that the Site had never been managed in accordance with the Mason IMP and had

4

long ago reverted to a tidal marsh due to neglect, abandonment, and/or the forces of nature. Staff directed Sweeney to stop work and informed him that a marsh development permit was required prior to developing the Site. Staff also conveyed that any work that could not be retroactively approved through the permit process would likely need to be removed and the Site restored to tidal marsh. BCDC staff recommended that Sweeney restore the Site, or apply for a marsh development permit. Sweeney was also advised that potential future enforcement could include cease and desist orders and a civil penalty.

For several months, the parties exchanged correspondence regarding their divergent views about site conditions and the necessity for a permit. BCDC staff continued to investigate and made additional Site visits.[2]

In April 2016, BCDC's Executive Director Lawrence Goldzband issued Executive Director Cease and Desist Order No. ECD2016.01 (Interim Cease and Desist Order). The Interim Cease and Desist Order directed Respondents to cease and desist from all unauthorized, unpermitted activities at the Site.

---

[2] Meanwhile, in July 2015, the Regional Water Quality Control Board (Regional Board) began separate enforcement proceedings against Respondents for alleged violations of the federal Clean Water Act and the California Water Code (the Porter-Cologne Water Quality Act). In September 2015, the Regional Board issued a Cleanup and Abatement Order to Respondents, which was eventually rescinded after Respondents filed a successful writ petition to stay the order. In 2016, the Regional Board issued a new Cleanup and Abatement Order and an Administrative Civil Liability Order. Respondents successfully challenged both of those orders in the superior court. The Regional Board's appeal of those decisions as to the 2016 Cleanup and Abatement Order and Administrative Civil Liability Order is pending before this court and decided today in *Sweeney v. California Regional Water Quality Control Board*, Case Nos. A153583 & A153585.

The Interim Cease and Desist Order was followed in May 2016 with a Violation Report/Complaint for the Administrative Imposition of Civil Penalties, and formal enforcement proceedings began against Respondents. The Violation Report/Complaint alleged numerous violations related to improperly placing fill within the Site and developing it without proper permits. It proposed a civil penalty of $952,000 for more than two dozen separate violations of state law.

An enforcement hearing before BCDC's Enforcement Committee was held in October 2016, consisting of a subset of commissioners appointed to assist BCDC in carrying out its enforcement responsibilities. The Enforcement Committee adopted the Executive Director's recommended enforcement decision but reduced the proposed penalty to $772,000. A month later, BCDC adopted without change the recommended enforcement decision as approved by the Enforcement Committee.

In November 2016, BCDC issued Cease and Desist and Civil Penalty Order No. CDO 2016.02 (BCDC Order or Order). BCDC made nearly 50 findings regarding the Site and Respondents' activities. It ordered Respondents to cease and desist from placing any fill within the Site, or making any substantial changes to any part of the Site that was or had been subject to tidal action before Sweeney's unauthorized work. Respondents were further ordered to refrain from engaging in any development activity at the Site without permits for any past, ongoing, or future work. In addition, Respondents were directed to submit plans to restore the Site and mitigate the impacts to wetlands due to their unauthorized activities. They were ordered to pay $772,000 in administrative penalties.

In December 2016, Respondents petitioned under Code of Civil Procedure section 1094.5 for a peremptory writ of mandate to invalidate the

6

BCDC Order.  The trial court granted the petition and set aside the Order.
BCDC and Goldzband now appeal.

## DISCUSSION

### I.     Standard of Review

Challenges to BCDC's permitting decisions or cease and desist orders
are made by filing a "petition for a writ of mandate in accordance with the
provisions of Section 1094.5 of the Code of Civil Procedure."  (Gov. Code, §
66639 [allowing aggrieved party to file mandamus petition with superior
court to review a BCDC order]; Pub. Resources Code, § 29601 ["Any aggrieved
person may seek judicial review of any decision or action of [BCDC] by filing
a petition for a writ of mandate in accordance with the provisions of Section
1094.5 of the Code of Civil Procedure…"].)

Code of Civil Procedure section 1094.5, our state's administrative
mandamus provision, provides the procedure for judicial review of
adjudicatory decisions rendered by administrative agencies.  (*Topanga Assn.
for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.)
"The inquiry in such a case shall extend to the questions whether the
respondent has proceeded without, or in excess of, jurisdiction; whether there
was a fair trial; and whether there was any prejudicial abuse of discretion.
Abuse of discretion is established if the respondent has not proceeded in the
manner required by law, the order or decision is not supported by the
findings, or the findings are not supported by the evidence."  (Code Civil.
Proc., § 1094, subd. (b).)

"The scope of our review of a challenged permitting decision is the same
as that of the trial court.  [Citations.]  [¶]  An 'agency's findings and actions
are presumed to be supported by substantial evidence.  [Citations.]  A person
challenging an administrative determination bears the burden of showing the

7

agency's findings are not supported by substantial evidence. [Citations.] When reviewing the agency's determination, the court examines the whole record and considers all relevant evidence, including that which detracts from the administrative decision.' [Citation.] ' "Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and inferences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." ' " (*Sustainability*, *supra*, 226 Cal.App.4th at p. 916.)

## II.    **Permit Requirements under the Preservation Act**

The Preservation Act recognizes that Suisun Marsh "represents a unique and irreplaceable resource" and that "future residential, commercial, and industrial developments could adversely affect the wildlife value of the area." So, "it is the policy of the state to preserve and protect resources of this nature for the enjoyment of the current and succeeding generations." (Pub. Resources Code, § 29002.)

Unless an exception applies, any person wishing to perform or undertake any development[3] in Suisun Marsh must obtain a marsh

---

[3]    "Development" means "on land, or in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land . . . , and any other division of land including lot splits . . . ; change in the intensity of use of water or in access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes." (Pub. Resources Code, § 29114.)

8

development permit.  (Pub. Resources Code, § 29500.)  Within Suisun Marsh's primary management area, such development permits shall be obtained from BCDC.  (Pub. Resources Code, § 29501.)  BCDC issues the permit "if it finds that the proposed development is consistent with the provisions of the Preservation Act and the policies of the certified local protection program."  (Pub. Resources Code, § 29520.)

Here, BCDC found Respondents performed work in Suisun Marsh which required a marsh development permit, which they failed to obtain. The trial court set aside the BCDC Order because it found Respondents were exempt from the marsh development permit requirement based on the "repair exception" in Public Resources Code section 29508, subdivision (b) (Section 29508(b)) and the exception for work consistent with a site's local protection program in Public Resources Code section 29501.5 (Section 29501.5).  BCDC contends neither exception applies.  We agree.

A.     Section 29508(b)

Section 29508(b) states: "[N]o marsh development permit shall be required" for "Repair, replacement, reconstruction, or maintenance that does not result in an addition to, or enlargement or expansion of, the object of such repair, replacement, reconstruction, or maintenance."  (Pub. Resources Code, § 29508, subd. (b).)

The parties dispute whether Respondents' work constituted a "repair" and whether there was even an "object of such repair" at the Site when Sweeney's work began.  Even if we assume without deciding that Respondents' work constituted a "repair" and the breached levee was the

9

"object of such repair" within the meaning of Section 29508(b), the exception would not apply.[4]

Under the plain meaning of Section 29508(b), any repair or maintenance exempt from permit requirements must "*not result in an addition to, or enlargement or expansion of, the object of such repair*." (Pub. Resources Code, § 29508, subd. (b), emphasis added.) Thus, any work undertaken by Respondents that went beyond fixing or maintaining the breached levee as the "object of … repair" does not qualify for the exemption. Neither would work completely unrelated to the breached levee.

BCDC found Sweeney performed quite a lot of work that went well beyond levee repair or was completely unrelated to the levee. Apart from any work done to repair the breached levee, BCDC found Sweeney also removed and replaced one of the former water control structures from the Site; replaced a sunken dock located in the southeast portion of the Site with a larger dock at the same location; added roads and land bridges to the Site; excavated multiple crescent ponds in the interior of the Site; removed, mowed, grazed, or flattened tidal marsh vegetation throughout the Site interior; placed shipping containers and mobile containers on the Site; installed two helicopter pads; and began operating the site as a kiteboarding business. Substantial evidence supported each of BCDC's findings. We have no difficulty concluding the Section 29508(b) exception for repairs did not apply and that the trial court incorrectly set aside the Order on this basis.

## B.    Section 29501.5

Section 29501.5 provides: "Notwithstanding the provisions of Section 29500, within the primary management area no marsh development permit

---

[4]    We do not address the BCDC's argument that Respondents failed to exhaust administrative remedies in asserting this exemption since we conclude the exemption did not apply.

10

shall be required for any development specified in the component of the local protection program prepared by the Suisun Resource Conservation District and certified by the commission pursuant to Section 29415." (Pub. Resources Code, § 29501.5.) Under this provision, work undertaken at a site that is consistent with a site's local protection program, or IMP, does not require a marsh development permit.

The parties agree that the local protection program for the Site is the Mason IMP that was certified in 1984. BCDC staff provided a copy of it to Sweeney during the November 2014 Site visit. But the parties dispute whether the Mason IMP still applies. In BCDC's view, the Mason IMP effectively expired because the Site's prior owners never complied with it, and the site reverted to tidal marsh when the exterior levee was allowed to deteriorate. Since the purpose of an IMP is to provide standards for managed wetlands, the Site's reversion to tidal marsh meant it was no longer a managed wetland and the Mason IMP no longer applied. Thus, the Commission required Respondents to procure a marsh development permit for their activities which they failed to secure. Respondents contend nothing in the Public Resources Code restricts IMPs to managed wetlands or provides for their expiration. They argue the Mason IMP continued to be valid, and the work they undertook was consistent with it and thus exempt from any permit requirement. Even if we assume the Mason IMP remains effective, Sweeney's work was not exempt from the permit requirements in Section 29501.5.

It is readily apparent the Mason IMP does not contemplate much of the work performed by Sweeney. It was prepared in 1984 for the "small lone club located on Buckley Island . . . contained with a single levee." The Mason IMP describes two water control structures: "(a) a main flood gate on the east side

11

that functions to bring water into the club via a perimeter ditch system; and (b) a structure on the north side used to drain the club into Grizzly Bay. It identifies "Club Improvements" which include "Water Management" and "Vegetation Management." Among the "needed improvements" contemplated for water management is "inspection and maintenance of levees, ditches, and water control structures. Ditches need to be kept clear of vegetation blockages or silt build-ups to allow circulation and drainage . . . . Levees require frequent inspection and attention prevent major breaks from occurring." The "needed improvements" for managing vegetation entails "reduc[ing] by burning and/or discing" of the "dense growth of undesirable vegetation in the pond . . . followed by flooding." Mowing emergent pond vegetation and levee vegetation is also allowed.

BCDC found Sweeney performed a lot of work that went well beyond what was discussed in the Mason IMP. Even if some of Sweeney's work, such as levee repair, ditch excavation, and vegetation management comported with the Mason IMP, there were various projects and construction that exceeded the type of maintenance allowed under it. As discussed above, Sweeney replaced a sunken dock located in the southeast portion of the Site with a larger one. He added roads and land bridges to the Site. He excavated multiple crescent ponds in the Site's interior. He placed shipping containers and mobile containers on the Site. He installed two helicopter pads. He began operating the site as a kiteboarding business. All these findings were supported by substantial evidence. Many, if not most, of Sweeney's changes had no reasonable connection to the management contemplated in the Mason IMP, and thus were inconsistent with that local protection program.

While Sweeney contends his activities were "nothing more than levee repair," there is substantial evidence in support of BCDC's findings that his work far exceeded the scope authorized in the Mason IMP. Further, even if Sweeney's levee work was repair rather than reconstruction, and the ditch excavation, tide gate installation, and vegetation management were consistent with the Mason IMP, Sweeney's work at the Site went well beyond these projects.[5] Under the most expansive view, Sweeney's claim that all his work was levee repair is unreasonable. The Section 29501.5 exception did not apply and the trial court's decision to vacate the BCDC's Order on this basis was also improper.

## III. Penalties

BCDC assessed respondents $772,000 in civil administrative penalties. Its staff had proposed a penalty of $952,000 under the McAteer-Petris Act for multiple violations that occurred over periods from 2 months to 1.5 years. The most substantial proposed penalties were $210,000 for placing fill in the Bay to close each of seven tidal breaches of the original levee; $120,000 for excavating four crescent ponds in the Site's interior and placing the fill adjacent to each pond; and $222,000 for placing 10 mobile trailers and storage containers on the Site. Other violations, including removal and replacement of the water control structure, development of the Site as a kiteboarding facility, and installation of two helicopter landing pads, resulted in proposed penalties each ranging from $30,000 to $60,000. BCDC's Enforcement Committee determined that that placement of fill to close each

---

[5]    As stated above, Sweeney also built the four crescent ponds, the dock and dock expansion, construction of two land bridges, removal of a former water control structure, the seven trailers/storage containers, the two helipads, the three wind-breaks, and change in use to operation of a kiteboarding business.

of the tidal breaches of the former levee should be treated as single violation rather than seven and on this basis reduced the proposed penalty to $772,000, which was the penalty ultimately adopted by BCDC.

The trial court found that penalty exceeded the limits imposed by the Mc-Ateer Petris Act and was unsupported by the findings. It also found it violated the Eighth Amendment prohibition on excessive fines. BCDC argues both conclusions were wrong. We agree.

### A.    McAteer-Petris Act

The Mc-Ateer Petris Act authorizes BCDC to impose civil penalties for any violation in an amount of not less than $10, but no more than $2,000 per day, up to a cap of $30,000 per violation. (Gov. Code, § 66641.5, subd. (e).) A reviewing court will not disturb an administrative penalty unless the challenger demonstrates there has been a manifest abuse of discretion. (*Cadilla v. Board of Medical Examiners* (1972) 26 Cal.App.3d 961, 967.) "Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed." (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 53–54.) What penalty is appropriate is considered to be particularly within the agency's discretion, dependent on the agency's expert knowledge. (*Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692.)

The trial court set aside the penalties and concluded BCDC abused its discretion, exceeded its jurisdiction, and did not proceed in the manner required by law. Recognizing the $30,000 cap for a single violation and BCDC's $772,000 penalty, the trial court deduced that BCDC would had to have found at least 26 violations. According to the court, the "Order identifies only 8 violations, as listed in subparagraphs (a) through (h) of paragraph II.XX" and was thus not supported by the findings.

14

BCDC did not abuse its discretion because the penalty it imposed was readily supported by its findings.[6]  The "8 violations" described by the trial court referred to BCDC findings that summarized the more than two dozen separate violations BCDC had enumerated for Respondents over the course of the enforcement proceeding.  The Violation Report/Complaint sent to Respondents set forth in a two-page table the penalized work undertaken by Respondents, explains the violation and number of violations for the work, and the monetary amount of each violation that went into the $952,000 proposed penalty.  Over two dozen separate violations were identified for Respondents.  At the enforcement hearing, the Enforcement Committee reduced the proposed penalty to $772,000 and explained it did so specifically because it counted Respondents' repair of the seven levee breaches to be a single violation penalized at the $30,000 statutory maximum rather than seven separate violations penalized at $210,000.  The Committee's

_____

[6]    Finding WW in the BCDC Order states: "Respondents have violated and continue to violate the [Act] by conducting the unpermitted activities at the Site as described herein, including but not limited to: [¶] 1. Placing fill in waters of San Francisco Bay, including tidal marsh, by constructing and rebuilding levees, excavating ditches and four crescent shaped ponds, installing a new dock in Anne Mason Slough, constructing roads, and placing numerous containers, trailers, and other structures and two helipads on tidal marsh; and [¶] 2. Making substantial changes in the use of water, land, or structures within the area of [BCDC's] jurisdiction by:  [¶] a. closing all the tidal breaches that existed in 2011 when Mr. Sweeney purchased the Site and thereby cutting off all tidal activity to the interior of the Site;  [¶] b. installing a new water control structure in the western portion of the Site; [¶] c. draining the Site to further alter the pre-existing tidal marsh hydrology; [¶] d. removing or destroying tidal marsh vegetation by the placement of fill, excavation activities, mowing activities, drainage activities, and [¶]  bringing goats to the Site and allowing those goats to graze on the tidal marsh vegetation; e. installing numerous trailers and containers and two mobile helipads at the Site; and [¶] f. developing and operating the Site for intensive recreational uses including but not necessarily limited to kite-boarding."

15

recommendation to BCDC clearly explained the reduction, and BCDC adopted $772,000 as the penalty. The BCDC Order adequately reflected, categorized, and summarized the dozens of violations listed in the Violation Report/Complaint.

Respondents insist that BCDC had to list in its enforcement order each of the separate violations it alleged. They add that "the absence of a clear list of violations foreclosed judicial review" of important issues. Not so. "In determining whether the decision is supported, we require findings to 'bridge the gap between the analytical gap between the raw evidence and ultimate decision or order." [Citation.] The findings need not be stated with the precision required in the judicial proceedings. [Citation.] They may properly incorporate matters by reference, and even omissions may be filled by such relevant references as are available in the record. [Citation.] 'Thus, where reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' " (*Craik v. County of Santa Cruz* (2000) 81 Cal.App.4th 880, 884–885.) BCDC's findings on its penalty determination sufficiently "bridge the gap" between the evidence and its order. The grounds for the $772,000 penalty can readily be derived from the record.

Respondents further contend that the penalty should be set aside for BCDC's failure to consider the factors in Government Code section 66641.9, for each of the violations before imposing the penalty. That provision states: "In determining the amount of administrative civil liability, [BCDC] shall take into consideration the nature, circumstance, extent, and gravity of the violation or violations, whether the violation is susceptible to removal or

16

resolution, the cost to the state in pursuing the enforcement action, and with respect to the violator, the ability to pay, the effect on ability to continue in business, any voluntary removal or resolution efforts undertaken, any prior history of violations, the degree of culpability, economic savings, if any, resulting from the violation, and such other matters as justice may require." (Gov. Code, § 66641.9, subd. (a).) Again, the BCDC Order reflects that the Commission did sufficiently consider these factors. BCDC devoted a paragraph of analysis to each factor before imposing the penalty. There was no abuse of discretion.

### B. Eighth Amendment

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)

The prohibition on excessive fines in the Eighth Amendment " 'limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense." ' " (*United States v. Bajakajian* (1998) 524 U.S. 321, 328 (*Bajakajian*).) The California Constitution contains a similar protection. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 (*R.J. Reynolds*).)[7] The touchstone of constitutional inquiry under the excessive fines clause is the principle of proportionality. (*Bajakajian*, at p. 334.) The amount of the fine must bear some relationship to the gravity of the offense that it is designed to punish, and a fine that is grossly disproportional to the gravity of the defendant's offense violates the excessive fines clause. (*Ibid.*) In deciding the matter, we consider "(1) the defendant's culpability; (2) the relationship between the harm and the

---

[7] Article I, section 17 of the California Constitution states: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.)

penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*R.J. Reynolds*, at pp. 728, 730.) "We review de novo whether a fine is constitutionally excessive and therefore violates the Eighth Amendment's Excessive Fines Clause." (*United States v. Lewis* (9th Cir. 2003) 62 Fed.Appx. 757, 762; see also *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 435–36 (*Cooper*).).[8]

The trial court concluded the fines imposed here violated the Eighth Amendment's prohibition against excessive fines and set them aside. The court found Respondents' culpability was low; the penalty was grossly disproportional to the harm caused; there was a gross disparity between penalties imposed by the BCDC for similar behavior; and that Respondents could not afford to pay the penalty imposed. Based on our review of the record, we reach a different conclusion as to each of these factors. Many of these factors overlap with or are similar to those considered by BCDC under the McAteer-Petris Act.

BCDC's findings characterize Respondents' culpability as substantial. The findings state that "Respondents' conduct at the Site was unreasonable and demonstrated a willful indifference to the regulatory permitting process that is intended to protect water quality, beneficial uses, and to prevent illegal discharges." This characterization was based on evidence that Sweeney interacted with various government agencies with jurisdiction over Suisun Marsh and was previously found in violation for levee work he did at another property. Respondents argue there are no facts to suggest Sweeney should have known he needed a BCDC permit at the Site, which supports the trial court's conclusion that "there is no evidence [Sweeney] should have

---

[8]    Respondents suggest we apply a substantial evidence standard in reviewing the trial court's finding of excessiveness. But they provide no authority for this contention which goes against the weight of authority.

18

known he needed a permit from [BCDC]." The trial court's conclusion was misplaced. It was "for the Commission to weigh the preponderance of conflicting evidence" and reversal can be justified "only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." (*Sustainability*, *supra*, 226 Cal.App.4th at p. 916.) That was not the case here. Moreover, BCDC found Respondents continuously performed work at the Site after BCDC staff directed Sweeney to stop work. Respondents have not addressed these findings.

The relationship between the harm and the penalty was also significant when evaluated in the context of numerous findings BCDC made as to the nature, circumstances, extent, and gravity of Respondents' violations. BCDC explained, "Excavation of tidal marsh at the Site physically removed estuarine habitat and the placement of fill eliminated surface water and wetland habitats. The harm from Respondents' unauthorized filling, destruction of tidal marsh, and cutting-off of tidal action at the Site was and is substantial, has adversely impacted beneficial uses of Suisun and Grizzly Bays, and likely resulted in the illegal take of threatened or endangered species protected under the California and federal Endangered Species Acts. Unauthorized filling and excavation activities occurred outside work activity windows established to protect sensitive species in the Suisun Marsh. Blocked tidal channels at the Site are preventing longfin smelt from being able to access spawning grounds, young salmonids from accessing feeding grounds, and have cut off the export of food material from the Site's interior wetlands needed to support the threatened Delta smelt." Although Respondents dispute these findings, we have no grounds in the record to reverse them. (*Sustainability*, *supra*, 226 Cal.App.4th at p. 916 [reversal

19

proper only where "a reasonable person could not have reached the conclusion" reached by agency].)

As to the penalties imposed in similar statutes, this factor has been explained as "the sanctions imposed in other cases for comparable misconduct." (*Cooper*, *supra*, 532 U.S. at p. 435.) We disagree with Respondents' argument that the penalty was excessive simply because it represented BCDC's "highest penalty ever." The penalty was large because it was based on more than two dozen violations found by BCDC to have occurred over a prolonged period of time. (See *Ojavan Investors, Inc. v. California Coastal Commission* (1997) 54 Cal.App.4th 373, 398 [$9.5 million civil penalty against a developer for 73 violations of Coastal Act not excessive].) We also are not persuaded by Respondents' contentions that the penalty was excessive because of its comparison to regulatory action or inaction undertaken by BCDC at other duck hunting clubs for levee repair and containers. None of Respondents' points of comparison appear to represent a level of work and development similar to what Respondents undertook at the Site.

BCDC considered the final factor, Respondents' ability to pay. On this point the Order stated, "The Regional Board staff investigated and analyzed Respondents' financial resources, and determined that Respondents have the ability to pay a substantial penalty." The Regional Board's ability to pay analysis estimated Respondents' assets at $4.2 million. In light of total penalties from multiple regulatory agencies, Respondents contend the Board's calculation was too high and misguided. But aside from their hyperbolic arguments against the penalty and Sweeney's declarations about problems with the Regional Board's calculation, Respondents did not include any objective information about their financial condition in the record when

20

they raised the issue in their Statement of Defense before the Enforcement Committee (e.g., financial statements, tax returns) even though they had the opportunity to do so. (Cal. Code Regs., tit. 14, § 11332 [requiring submission of all copies of documentary evidence respondent wants to be part of the record with completed statement of defense form]). When they attempted to provide such information at the full BCDC hearing, it was too late. On this record, the $772,000 penalty was not unreasonable in light of Respondents' ability to pay.

We cannot conclude that the $772,000 in civil penalties was "grossly disproportional" to the gravity of the offense so as to violate the Eighth Amendment. The penalty did not violate the excessive fines clause.

## IV. Vindictive Prosecution

"The constitutional protection against prosecutorial vindictiveness is based on the fundamental notion that it 'would be patently unconstitutional' to 'chill the assertion of constitutional rights by penalizing those who choose to exercise them.'" (*In re Bower* (1985) 38 Cal.3d 865, 873.) When a "defendant shows that the prosecution has increased the charges in apparent response to the defendant's exercise of a procedural right, the defendant has made an initial showing of an appearance of vindictiveness." (*People v. Puentes* (2010) 190 Cal.App.4th 1480, 1486.) "Once this prima facie case is made, the prosecution bears a 'heavy burden' of dispelling the appearance of vindictiveness as well as actual vindictiveness." (*Ibid*.)

The trial court found Respondents made such an initial showing because BCDC imposed record penalties after Sweeney filed a successful writ petition to stay the Regional Board's 2015 Cleanup and Abatement Order. (*Ante*, fn. 2.) BCDC contends the trial court improperly set aside the penalties on vindictiveness grounds. We agree with BCDC.

21

As an initial matter, Respondents cite no authority, and we have found none, that applies the vindictive prosecution doctrine in a context outside of criminal proceedings. We conclude the court erred in setting aside BCDC's civil administrative order and penalties for this reason. The vindictive prosecution doctrine has not yet been held to apply to proceedings before administrative bodies.

Even if the doctrine applied, Respondents made no prima facie showing that BCDC "increased the charges" against them in response to their exercise of any procedural right against BCDC. Apart from the lawsuit underlying this appeal, there is no evidence that Respondents ever exercised a procedural right against BCDC. Respondents rely upon their 2015 writ petition to stay the Cleanup and Abatement Order but that was directed to the Regional Board, a separate regulatory agency. Also, Respondents' assertion that BCDC imposed increased penalties on them because they filed this writ petition is simply not supported by the record. BCDC staff previewed the possibility of civil penalties and notified Sweeney it was "handling this matter as an enforcement case" in January 2015, well before Respondents' writ petition was filed in December 2015. Prior to the December 2015 petition, BCDC had no "charges" pending against Respondents that it could increase after Respondents filed the petition. The Interim Cease and Desist Order was not issued until April 2016, and the Violation Report/Complaint for Civil Penalties was not issued until May 2016, following investigation by BCDC staff. Thus, BCDC's only "charges" came after Respondents' writ petition, and there is no showing penalties were ever increased on account of it. Under these facts, Respondents made no prima facie case.

V.     **Fair Hearing**

22

## A.    Separate Functions

"One of the basic tenets of the California [Administrative Procedure Act] . . . is that, to promote both the appearance of fairness and the absence of even a probability of outside influence on administrative hearings, the prosecutory and, to a lesser extent, investigatory, aspects of administrative matters must be adequately separated from the adjudicatory function." (*Nightlife Partners v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 91, italics omitted.)  "To prove a due process violation based on overlapping functions thus requires something more than proof that an administrative agency has investigated and accused, and will now adjudicate.  '[T]he burden of establishing a disqualifying interest rests on the party making the assertion.' … That party must lay a 'specific foundation' for suspecting prejudice that would render an agency unable to consider fairly the evidence presented at the adjudicative hearing … it must come forward with 'specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias'….  Otherwise, the presumption that agency adjudicators are people of 'conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances' will stand unrebutted." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal. 4th 197, 221–222.)  We independently review the claim BCDC failed to afford Respondents a fair hearing.  (See *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 531 (*Pleasanton*); *TWC Storage, LLC v. State Water Resources Control Bd.* (2010) 185 Cal.App.4th 291, 296.)

The trial court found the prosecutorial and adjudicatory functions of the agency were insufficiently separate and disapproved of how the prosecution team "prepared the summary memos on which [ BCDC] relied"

23

and thus "impermissibly commingled the prosecution function with the judicial-making function." BCDC contends the trial court erred in setting aside its Order on these grounds. We agree.

### 1. BCDC's Enforcement Procedures

BCDC's adjudicatory procedures for enforcement actions are set forth in Title 14, Code of California Regulations, section 11300 et seq. Under these procedures, BCDC can hear some enforcement matters directly. But when the violations involve complex facts, its Enforcement Committee can hear a matter before BCDC as a whole considers whether to issue an enforcement order. (Cal. Code Regs., tit. 14, §§ 11310, subd. (b), 11323–11324.)

In cases where BCDC staff assesses significant harm and the executive director refers a matter to the enforcement committee, formal enforcement proceedings begin with BCDC staff issuance of a violation report and complaint for civil penalties to the respondent, which is the party believed to be responsible for the alleged violation. (Cal. Code Regs., tit. 14, § 11321.) BCDC staff also send a Statement of Defense form so the responsible party can respond to the allegations. (Cal. Code Regs., tit. 14, § 11322.).

Before the enforcement hearing, BCDC's Executive Director mails the violation report, the respondent's completed Statement of Defense form, and the Executive Director's recommended enforcement decision to the respondent and to Enforcement Committee. (Cal. Code Regs., tit. 14, § 11324.) At the hearing, BCDC staff summarize the violation report and the recommended enforcement decision, and the respondent states his position. (Cal. Code Regs., tit.14, § 11327.) Oral testimony may be taken under oath, and cross-examination is permitted under certain circumstances. (Cal. Code Regs., tit. 14, § 11227.) A Deputy Attorney General attends the hearing to advise the Enforcement Committee on legal issues. (Cal. Code Regs., tit. 14,

24

§ 11229.)  The Enforcement Committee adopts a recommended enforcement decision, which may be the Executive Director's recommendation or a modification of it.  (Cal. Code Regs., tit. 14, § 11330.)

The full BCDC then considers the Enforcement Committee's recommended decision.  (Cal. Code Regs., tit. 14, § 11331.)  BCDC staff, the respondent, and members of the public may present arguments on the recommendation subject to reasonable time limits.  (Cal. Code Regs., tit. 14, § 11332.)  Thereafter, the BCDC votes to either adopt the recommended enforcement decision without change, adopt it in part, dismiss the entire matter, remand the matter for further action, or reject the recommended enforcement decision and decide the matter de novo.  (Cal. Code Regs., tit. 14, § 11332.)  The BCDC decision is made by majority vote of those present and voting.  (Cal. Code Regs., tit. 14, § 11334.)

### 2.  *Respondents' Hearing*

Based on our review of Respondents' hearing transcript, we have no reason to conclude Respondents received an unfair hearing based on insufficiently separated functions.  BCDC adhered to its procedures in the course of Respondents' hearing, and its process was similar to the one validated in *Pleasanton*, *supra*, 211 Cal.App.4th 522.

In *Pleasanton*, *supra*, 211 Cal.App.4th 522, the plaintiff brought a retirement pay claim before the Public Employees' Retirement System (PERS).  (*Id.* at p. 528.)  An evidentiary hearing was held before an administrative law judge (ALJ) who denied the claim.  (*Id.* at p. 529.)  The ALJ decision was submitted to the PERS board to determine whether to adopt the ALJ decision or take other action.  (*Ibid.*)  Accompanying the proposed decision was a PERS staff report in support of the proposed ALJ decision.  (*Id.* at pp. 529-530.)  Also included was a document prepared by the

plaintiff's counsel advocating for the rejection of the proposed decision. (*Id.* at p. 530.) The court found no due process violation merely because a staff report was included with the ALJ's recommended decision. (*Id.* at pp. 531-532.) The court explained, "As long as both sides' arguments on the issue were presented to the board at the same time, no agency staff involved in handling [the plaintiff's] appeal voted or acted in any supervisory capacity over voting members on the board itself, and there were no ex parte contacts between agency staff and board members about the decision, we perceive no due process problem." (*Ibid.*)

Here, the process conformed to the fairness principles set forth in *Pleasanton*. Both BCDC staff and Respondents' counsel presented arguments at the Enforcement Committee hearing, and then presented their views on the Committee's recommended enforcement decision to the full BCDC. Moreover, the Commissioners were the ones to vote at the Enforcement Committee hearing and then the full BCDC session. Agency staff had no vote in either proceeding, and there is no evidence that staff acted in any supervisory capacity over any of the Commissioners. Nor was there any finding by the trial court that any staff had ex parte communications with any Commissioner. BCDC staff submitted declarations to make clear they had no ex parte communications with Commissioners. Since BCDC's prosecutorial and adjudicatory functions were appropriately separate, there was no due process violation.

Respondents assert the functions were not separate because the Executive Director was part of the agency's decision-making team as an advisor and was not independent of the agency prosecutors who prepared and sent his recommended enforcement actions to the Enforcement Committee and BCDC. Not so. The Executive Director was not a decision-maker. (See

26

Gov. Code, § 66635 [executive director is position appointed by the BCDC].) He did not vote as either a member of the Enforcement Committee or as part of BCDC. Nor did he advise the decision-makers. By statute, his role is to "administer[] the affairs of the commission, subject to the direction and policies of the commission." (Gov. Code, § 66635.) There is no evidence the Executive Director ever appeared at either the Enforcement Committee hearing, the proceeding before BCDC, or any other proceeding in an advisory role. Further, providing a recommended enforcement decision to BCDC did not make the Executive Director an advisor. Not only were such actions prescribed by BCDC regulations, they do not raise due process concerns as stated in *Pleasanton* where key boundaries are observed, as they were here. (See *Pleasanton*, *supra*, 211 Cal.App.4th at p. 533 [no authority says agency decision-making body is precluded from soliciting or receiving a written analysis and recommendation from the agency's prosecuting attorney delivered to it as part of a public agenda packet along with the adversary's opposing analysis and recommendation"].)

Respondents contend *Pleasanton* is distinguishable because there, the ALJ was "independent and impartial" and the respondents had a chance to submit comments to the administrative body explaining why they opposed it. We are not persuaded. In administrative proceedings, there is no requirement for an independent decision maker. "[B]y itself, the combination of investigative, prosecutorial, and adjudicatory functions within a single administrative agency does not create an unacceptable risk of bias and thus does not violate the due process rights of individuals who are subjected to agency prosecutions." (*Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737 (*Morongo*).) Also, simply because the Enforcement Committee members were Commissioners, rather

27

than separate ALJs, does not mean they were not impartial. (See *ibid.* ["Unless they have a financial interest in the outcome [citation], adjudicators are assumed to be impartial."].) There is nothing in the record to rebut the presumption that each of the Commissioners involved was a " 'reasonably impartial, noninvolved reviewer.' " (*Linney v. Turpen* (1996) 42 Cal.App.4th 763, 775–777.) Finally, even if the process did not allow Respondents to submit comments alongside the Enforcement Committee's recommended enforcement decision, BCDC regulations allow Respondents to "present their . . . arguments on the recommendation" (Cal. Code Regs., tit. 14, § 11132, subd. (a)), and they did. Again, Respondents identify no arguments they were unable to present to the BCDC that would have led to a different outcome.

Lastly, Respondents claim the agency prosecutors had ex parte communications with Commissioners because the 9-page staff report "magically appeared" in the Enforcement Committee's Recommended Decision, and that could not have happened without some ex parte communication. Not so. All were present at the hearing when the Enforcement Committee members voted its recommendation on the record. On this basis, all parties and the staff understood what the Enforcement Committee's recommendation would be. Preparing the recommendation would not normally require any further interaction between staff and Commissioners. We have no reason to disregard the uncontested declarations from BCDC staff confirming they had no ex parte communications with Commissioners.[9]

---

9     Further, BCDC regulations required the staff to send the Enforcement Committee's recommendation to BCDC and Respondents. (Cal. Code Regs., tit. 14, § 11331 ["At least ten (10) days prior to the Commission's reconsideration of a recommended enforcement decision . . . the staff shall

## 2. Totality of the Circumstances

Although adjudicators are presumed to be impartial, "the presumption of impartiality can be overcome" by "a particular combination of circumstances creating an unacceptable risk of bias." (*Morongo, supra,* 45 Cal.4th at p. 741.) This is sometimes referred to as the "totality-of-the circumstances approach." (*Id.* at p. 740.) The trial court also found Respondents' hearing was unfair based on the totality of the circumstances. BCDC contends this too was erroneous. Again, we agree.

The trial court found the hearing "appeared unfair because of the short time allowed for Plaintiffs to make their case." Based on BCDC's purported finding of over two dozen violations, the court deduced that "Plaintiffs had only about 2 minutes before the Enforcement Committee to make their case on each violation, and about 30 seconds before the BCDC itself" and found "these times were not sufficient for a fair trial in this case." There is no requirement that hearings last for any particular amount of time (see Cal. Code Regs., tit. 23, § 648 et seq.), and reasonable time limitations are necessary and inevitable. (Cf. *Reed v. California Coastal Zone Conservation Com.* (1975) 55 Cal.App.3d 889, 895 [petitioners who were restricted to 10 minutes' oral argument at hearing and never objected not denied due process].) The Enforcement Committee initially gave each party 45 minutes to present at the hearing, but after Sweeny objected and asked for 75 to 90 minutes, each side was given 60 minutes. The total hearing lasted more than three hours. This was not a denial of due process.

Regulations for proceedings before the full BCDC allow the parties "to present their respective arguments on the recommendation, subject to such

mail the recommended enforcement decision to all respondents and to all Commissioners."].) Staff did so.

29

reasonable time limits as the Chair may impose and subject to a prohibition against the introduction of any new evidence" except under circumstances inapplicable here. (Cal. Code Regs., tit. 14, § 11335.) Each side had 15 minutes to present its views on the Enforcement Committee recommendation to BCDC. This was reasonable in light of the hour each side was provided during the three-hour Enforcement Committee hearing. Moreover, in neither case do Respondents state what additional evidence or argument they were unable to present in the allotted time.

The trial court also criticized BCDC for failing to make a legal ruling on the statutory exemptions to the permit requirement that respondents claimed for the levee repairs. The court found the hearing "appeared to be unfair because there was no ruling on the legal issues." In the trial court's view, BCDC's refusal to rule on the exemptions "gave the impression that [BCDC] did not have to comply with the law." These findings simply do not reflect the record. Section 29501.5, which exempts from permit requirements development consistent with a site's IMP, was fully addressed during the course of the enforcement proceeding. The Enforcement Committee's recommended enforcement decision, which BCDC voted to adopt, addressed it, stating "the Annie Mason IMP no longer applied to the site." Finding "V" of the BCDC Order also addressed it, stating: "Even if the Annie Mason IMP still applied to the Site at the time Mr. Sweeney engaged in the above-described activities, which it did not, said activities were not described in and thus were not authorized by the Annie Mason IMP." As to the Section 29508(b) exception for repairs, Respondents never invoked it in their Statement of Defense, so BCDC reasonably did not rule on it.

Beyond the reasons set forth by the trial court, Respondents assert the unfairness finding was "supported by at least nine types of substantial

30

evidence." We need not address these in any detail. Eight of them do not indicate bias or prejudice on the part of the decisionmaker. (See *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1024, 1034.) Rather, they merely rehash arguments from Respondents' challenge to BCDC's penalty determination, or repeat arguments we have previously addressed. The one contention that could raise potential bias is Respondents' claim that BCDC's expert was "hostile" to Sweeney, had "personal enmity" towards him, and was in no position to be impartial in his assessment of Sweeney's work. Had Respondents truly believed BCDC's expert was prejudicially biased, Respondents could have raised such an objection before the Enforcement Committee or the full BCDC, but they did not. When given an opportunity to cross-examine the expert at the Committee's hearing, Respondents raised no question or concern about his impartiality, and did not ask him about communications he had with Sweeney.

## DISPOSITION

The judgment on the BCDC Order in Solano County Superior Court Case No. FCS048136 is reversed, and the writ of mandate is vacated. The matter is remanded to the trial court with directions to deny Respondents' petition for writ of mandate and request to set aside the BCDC Order, and for further proceedings consistent with this opinion.

Appellants are awarded costs on appeal.

31

_____
Siggins, J.*


WE CONCUR:


_____
Fujisaki, Acting, P.J.


_____
Jackson, J.

---

* Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/18/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN D. SWEENEY et al., <br><br>     Plaintiffs and Respondents, <br> v. <br> SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., <br><br>     Defendants and Appellants. | A153582 <br><br> (Solano County <br> Super. Ct. No.  FCS048136) <br><br> ORDER MODIFYING OPINION AND CERTIFYING FOR PUBLICATION; NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on February 18, 2021, be modified as follows:

At page 4, in the second full paragraph, the fourth sentence is revised to read:  "In October 2014, Sweeney transferred title to the Point Buckler Club, LLC (Point Buckler Club), for which he was the manager and principal shareholder."

In addition, pursuant to rule 8.1105(b) of the California Rules of Court, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

The petition for rehearing filed by Respondents on March 5, 2021, is denied.  There is no change in the judgment.

1

Dated: _____                    _____

Fujisaki, Acting P.J.